**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 92-8104
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

AMY RALSTON POFAHL,
CHARLES T. NUNN, and
RANDY WHITE,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
_____
(May 6, 1993)

Before REYNALDO G. GARZA, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants, Amy Ralston Pofahl ("Pofahl"), Charles T. Nunn ("Nunn"), and Randy White ("White"), were jointly tried before a jury and convicted of offenses stemming from a conspiracy to import into the United States and distribute 3,4-methylenedioxymethamphetamine ("MDMA" or "Ecstasy"). Pofahl, Nunn, and White were all convicted of conspiring to distribute and possess with intent to distribute MDMA, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988). Both Pofahl and Nunn were convicted of conspiring to import MDMA into the United States, in violation of 21 U.S.C. §§ 952(a), 963 (1988). Pofahl was also convicted of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)

(1988). All three defendants now appeal their convictions and sentences. We vacate Nunn's sentence and remand for specific findings of fact. Otherwise we affirm in all respects.

**I**

**A**

From 1985 until early 1989, Charles Pofahl[1] and Morris Key operated an elaborate conspiracy for the purpose of trafficking in MDMA, more popularly known as Ecstasy. Charles Pofahl hired Dr. Morris Key, a professional chemist, to assist in the production of MDMA. Raw chemicals were purchased in West Germany and shipped to Guatemala, where they were used to manufacture MDMA tablets. Key and Charles Pofahl then employed a number of individuals to smuggle the drugs into the United States, where an extensive network of distributors and dealers sold them to consumers. Between 1985 and 1989, several million MDMA tablets were manufactured by the Pofahl-Key operation, some of which were imported and sold. Large quantities of MDMA were seized by law enforcement officials.

Amy Pofahl met Charles Pofahl in 1985, and they married in November of that year. Amy Pofahl was personally involved in many aspects of her husband's drug trafficking operation. She traveled with him to Guatemala on several occasions when he was taking part in the management of the conspiracy. Amy Pofahl assisted Charles

---

[1] Charles Pofahl was the ringleader of the conspiracy which led to the convictions of Amy Pofahl, Charles Nunn, and Randy White. However, Charles Pofahl is not a party to this appeal. He was arrested in Germany, was tried and convicted by German authorities, and was incarcerated in Germany when Amy Pofahl, Charles Nunn, and Randy White were tried in the Western District of Texas.

Pofahl with counting and bottling MDMA tablets. She also introduced her former boyfriend, Larry Morrow, into the conspiracy and thereafter sold MDMA to him when he became a distributor. Amy Pofahl continued to sell MDMA and receive the proceeds of MDMA sales after Charles Pofahl's personal involvement in the conspiracy ended with his arrest in West Germany.

Charles T. Nunn served the conspiracy as a smuggler. Nunn transported 130,000 tablets of MDMA from Guatemala to the United States by car, and he was in Guatemala preparing to return with another shipment when he learned that Charles Pofahl had been arrested in Germany.

Randy White lived, worked, and sold MDMA in the Dallas area. White regularly received substantial quantities of MDMA))manufactured by the Pofahl-Key operation))from Tom and Dan Drath. The Draths received the MDMA from Charles Wesley Knight, who received it directly from Morris Key and Charles Pofahl. Randy White regularly sold MDMA to several lower-level distributors.

**B**

A cooperative investigation by state and federal authorities led to the arrests of a number of participants in the conspiracy, including Pofahl, Nunn, and White, all of whom were charged in an indictment alleging a variety of drug and money laundering offenses. Pofahl, Nunn, and White were tried together before a jury, which found all three defendants guilty of Count One of the indictment))conspiring to distribute and possess with intent to distribute MDMA, in violation of 21 U.S.C. §§ 841(a)(1), 846

(1988). Both Pofahl and Nunn were found guilty of Count Two))conspiring to import MDMA into the United States, in violation of 21 U.S.C. §§ 952(a), 963 (1988). The jury also found Pofahl guilty of Count Six))money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (1988).

The district court sentenced Pofahl to consecutive prison terms of 240 months for Count One and 52 months for Count Two. Pofahl received a concurrent term of 60 months on Count Six. The district court sentenced Nunn to 235 months imprisonment for Count One and a concurrent term of 60 months on Count Two. Randy White received a sentence of 109 months imprisonment.[2]

## C

Pofahl, Nunn, and White now appeal their convictions and sentences. All three appellants allege racial discrimination in the selection of the jury. Both Pofahl and White attack the sufficiency of the evidence to support their conspiracy convictions.

Pofahl raises several additional claims: (a) that the district court erred in its handling of her motion for appointment of a psychiatric consultant, pursuant to 18 U.S.C. § 3006A, and that her trial counsel was ineffective for failing to object to the district court's handling of the motion; (b) that the district court erroneously denied her motion to suppress evidence seized from her residences in violation of the Fourth Amendment; (c) that the

_____

[2] The three defendants also received terms of supervised release, fines, and special assessments.

district court, in imposing sentence, held her accountable for an excessive quantity of MDMA; (d) that her sentence was enhanced on account of an erroneous finding that she was a manager in the conspiracy; and (e) that her sentence was enhanced as a result of the district court's erroneous finding that she attempted to obstruct justice.

Charles Nunn argues that (a) the district court erred by denying his motion to sever, (b) the district court held him responsible at sentencing for an excessive quantity of drugs, (c) he should have been granted an offense level reduction as a minimal or minor participant in the conspiracy, (d) he was entitled to an offense level reduction for acceptance of responsibility, and (e) the district court erred by enhancing his sentence for possession of a firearm during the course of the offense without first specifically finding that he possessed the gun, as required by Fed. R. Crim P. 32(c)(3)(D).

Randy White claims that (a) his confession should have been suppressed, because it was given without the benefit of the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and (b) the district court at sentencing held him accountable for an excessive quantity of MDMA.

## II

### *Joint Claims*

#### A

Pofahl, Nunn, and White argue that their convictions must be reversed on account of racial discrimination in the selection of

-5-

the jury.  The appellants present several arguments to that effect, none of which has merit.

## (i)

Pofahl, Nunn, and White contend that the district court erred by overruling White's objection, premised on *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to the prosecutor's use of peremptory strikes to remove all of the African-Americans and Hispanic-Americans from the jury.  The Equal Protection Clause[3] forbids a prosecutor to exercise peremptory challenges against prospective jurors solely on account of their race.  *Id.* at 89, 106 S. Ct. at 1719.  To show that the prosecutor violated the Equal Protection Clause by her use of peremptory strikes, a defendant must first demonstrate that the facts raise an inference that the strikes were racially motivated.  *Id.* at 93-94, 106 S. Ct. at 1721.  Once the defendant makes that prima facie case, the prosecutor then has the burden of showing that the strikes were based on "permissible racially neutral selection criteria."  *See id*. at 94, 106 S. Ct. at 1721.  After the prosecutor offers a racially neutral explanation, the district court must determine whether the defendant has established purposeful racial discrimination.  *See id*. at 98, 106 S. Ct. at 1724.

---

[3]  The Equal Protection Clause of the Fourteenth Amendment pertains to the states, but *Batson* applies to federal, as well as state, criminal cases.  *See Brown v. United States*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) (federal criminal conviction reversed on the basis of *Batson*).

Following voir dire, counsel for White drew the district court's attention to the fact that the prosecutor had exercised peremptory strikes to remove from the jury the only two African-American venire members and the one Hispanic venire member. *See* Supp. Record on Appeal, vol. 7, at 74, 77. The district court apparently understood counsel to be making a *Batson* objection, and asked the prosecutor whether he could "state nondiscriminatory reasons for striking" the three venire members.[4] *See id.* at 74. The prosecutor answered that he generally tended to strike jurors "on economic grounds" rather than racial grounds. *See id.* at 75. In particular the prosecutor preferred "a middle class jury" made up of jurors "who work[ed] eight hours a day and [were] preferably salaried." *See id.*

---

[4] The Supreme Court contemplated that district courts faced with *Batson* objections would decide whether the facts supported an inference of racial discrimination. *See Batson*, 476 U.S. at 97, 106 S. Ct. at 1723. If the district court determined that the facts supported that inference, the government would then be required to come forward with race neutral explanations for its peremptory strikes. *See id.* Here the district court did not explicitly find that the facts supported an inference of racial discrimination. *See* Supp. Record on Appeal, vol. 7, at 74. The district court responded to the apparent *Batson* objection by immediately asking the prosecutor for race-neutral explanations for his peremptory challenges. *See id.* However, "[t]his departure from the normal course of proceeding need not concern us. . . . Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, ___ U.S. ___, ___, 111 S. Ct. 1859, 1866, 114 L. Ed. 2d 395 (1991); *see also United States v. Broussard*, ___ F.2d ___, ___ n.4, 1993 WL 72937, *5 n.4 (5th Cir. 1993) (declining to decide whether defendant had established prima facie case of racial discrimination, where district court required explanation for peremptory strikes).

The prosecutor offered specific reasons for striking each of the three contested venire members. *See id.* He stated that venireman Bolds was struck because he was single and a school bus driver. Based on those facts, the prosecutor surmised that Mr. Bolds probably earned low wages and was not employed full time. *See id.* The prosecutor said that he struck venireman Olivarez because he was a self-employed auto mechanic, and as a result it was not possible to determine how many hours Mr. Olivarez worked or how much money he earned. *See id.* at 76. The prosecutor also stated that he was suspicious of Mr. Olivarez's dress and demeanor. *See id.* The prosecutor asserted that he struck Ms. Sargent because she was not paying attention during voir dire. *See id.* at 75-76. After hearing these explanations, the district court overruled White's objection to the prosecutor's use of his peremptory strikes. *See id.* at 77.

Because only White objected to the prosecutor's use of peremptory challenges, see *id.* at 74-77, the government argues that Pofahl and Nunn are barred from raising a *Batson* claim on appeal. *See* Brief for United States of America at 26 n.13. Because a timely objection is an essential prerequisite to a *Batson* claim, we agree that neither Nunn nor Pofahl is entitled to assert such a claim. *See Wilkerson v. Collins*, 950 F.2d 1054, 1063 (5th Cir. 1992) (holding that failure to make timely *Batson* objection at trial was "a constitutional bar" to *Batson* claim), *petition for cert. filed,* (U.S. Mar. 18, 1992) (No. 91-7669); *Thomas v. Moore*, 866 F.2d 803, 805 (5th Cir.), *cert. denied,* 493 U.S. 840, 110 S.

Ct. 124, 107 L. Ed. 2d 85 (1989); *Jones v. Butler*, 864 F.2d 348, 369 (5th Cir. 1988), *cert. denied,* 490 U.S. 1075, 109 S. Ct. 2090, 104 L. Ed. 2d 653 (1989); *United States v. Forbes*, 816 F.2d 1006, 1011 (5th Cir. 1987); *United States v. Erwin*, 793 F.2d 656, 667 (5th Cir.), *cert. denied,* 479 U.S. 991, 107 S. Ct. 589, 93 L. Ed. 2d 590 (1986).

White's *Batson* argument lacks merit entirely.  "Where . . . the [district court] has entertained and ruled on a defendant's motion charging a *Batson* violation, we review only [its] `finding of discrimination *vel non*.'"  *United States v. Terrazas-Carrasco*, 861 F.2d 93, 94 (5th Cir. 1988) (quoting *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987)).  The district court's determination whether the prosecutor's strikes are racially motivated is purely factual, and largely turns on an evaluation of the prosecutor's credibility. *Hernandez v. New York*, ___ U.S. ___, 111 S. Ct. 1859, 1869, 114 L. Ed. 2d 395 (1991).  We review the district court's finding concerning the presence *vel non* of purposeful racial discrimination under the "clearly erroneous" standard.  *See Hernandez*, ___ U.S. ___, 111 S. Ct. at 1871; *Terrazas-Carrasco*, 861 F.2d at 94.  We will not find a district court's ruling to be clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed. *United States v. Mitchell*, 964 F.2d 454, 457-58 (5th Cir. 1992). The prosecutor's explanations of his peremptory strikes))focusing on employment, economic status, attentiveness, and demeanor))were certainly non-racial.  Furthermore, White does not argue, and the

record does not indicate, that the prosecutor's explanations lacked credibility.  Therefore, the district court's finding that the prosecutor's peremptory strikes were not racially motivated was not clearly erroneous, and White is not entitled to relief.

**(ii)**

Pofahl, Nunn, and White also contend that they are entitled to reversal because the jury was selected in violation of the Jury Selection and Service Act, 28 U.S.C. §§ 1861 et seq. (1988).[5]  We will not consider that claim, because it was not preserved below. The Act provides:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a).  By failing to act timely as directed by § 1867(a), a defendant waives her objection under the Act.  *See* 28 U.S.C. § 1867(e) ("The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title."); *United States v. Ballard*, 779 F.2d 287, 295 (5th Cir.), *cert. denied,* 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986); *United States*

---

[5]     28 U.S.C. § 1862 (1988) provides:

> No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States . . . on account of race, color, religion, sex, national origin, or economic status.

*v. Green*, 742 F.2d 609, 612 (11th Cir. 1984).  Because none of the appellants complied with § 1867(a), they are barred from raising a claim under the Jury Selection and Service Act on appeal.

**(iii)**

Pofahl, Nunn, and White also appear to claim that they were denied their Sixth Amendment right to a jury selected from a pool that represents a fair cross-section of the community.  *See Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S. Ct. 692, 697, 42 L. Ed. 2d 690 (1975).  In order to state a claim of that sort, the appellants must show that a distinctive group is generally and systematically excluded from jury venires.  *See Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986).  The appellants have not alleged, much less demonstrated, general and systematic exclusion of a distinctive group from jury venires in the Western District of Texas.  None of the appellants is entitled to reversal on the basis of their complaints regarding the selection of the jury.

**B**

Both Pofahl and White contend that the evidence was insufficient to support their convictions for conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988). Pofahl further argues that the evidence was insufficient to support her conviction for conspiracy to import a controlled substance, in

violation of 21 U.S.C. §§ 952(a), 963 (1988).[6]  Pofahl's and White's contentions are without merit.

**(i)**

"In deciding the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt."[7]  *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S.Ct. 2952, 119 L. Ed. 2d 575 (1992).  "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt."  *Id.*  "We accept all credibility choices that tend to support the jury's verdict." *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991).

In order to prove that a defendant conspired to distribute and possess with intent to distribute MDMA, in violation of 21 U.S.C.

---

[6]  Pofahl was also convicted of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Pofahl does not challenge the sufficiency of the evidence to support her conviction for money laundering.

[7]  This standard of review is applied here, because Pofahl and White properly preserved their sufficiency claims by moving for a judgment of acquittal at trial.  A more stringent standard is applied where the defendant fails to preserve her sufficiency claim. *See United States v. Galvan,* 949 F.2d 777, 782-83 (5th Cir. 1991) (applying "manifest miscarriage of justice" standard because defendant failed to move for directed verdict or for judgment of acquittal).

§§ 841(a)(1), 846,[8] the government must prove beyond a reasonable doubt that (1) there was a conspiracy[9] to distribute and possess with intent to distribute MDMA; (2) the defendant knew about the conspiracy; and (3) the defendant voluntarily joined in the conspiracy. *See United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1988) (citing *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.), *cert. denied*, 464 U.S. 842, 104 S. Ct. 139, 78 L. Ed. 2d 132 (1983)). The government must prove the same basic elements))existence of a conspiracy, knowledge, and voluntary participation))in order to convict an individual of conspiring to import MDMA in violation of 21 U.S.C. §§ 952(a), 963.[10] *See id.;*

---

[8]    Title 21, section 841(a)(1) provides:

[I]t shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .
21 U.S.C. § 841(a)(1) (1988).

Title 21, section 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
21 U.S.C. § 846 (1988).

[9]    A conspiracy consists of "an agreement by two or more persons to commit one or more unlawful acts and an overt act by one of the conspirators in furtherance of the conspiracy." *United States v. Romeros*, 600 F.2d 1104, 1106 (5th Cir. 1979), *cert. denied,* 444 U.S. 1077, 100 S. Ct. 1025, 62 L. Ed. 2d 759 (1980).

[10]    Title 21, section 952(a) provides:

It shall be unlawful . . . to import into the United States from any place outside thereof, any controlled substance . . . .
21 U.S.C. § 952(a) (1988).

*United States v. Williams-Hendricks*, 805 F.2d 496, 502 (5th Cir. 1986). "No evidence of overt conduct is required. A conspiracy agreement may be tacit, and the trier of fact may infer agreement from circumstantial evidence." *Hernandez-Palacios*, 838 F.2d at 1348 (citations omitted).

## (ii)

Amy Pofahl was convicted of two distinct conspiracies.[11] One concerned possession and distribution of MDMA, while the other concerned importation. Evidence presented by the prosecution established the existence of both conspiracies, as well as Pofahl's knowledge of and participation in both.

Witnesses presented by the prosecution testified to the existence of a conspiracy to import MDMA. Morris Key testified that he met with Charles Pofahl in February of 1985, and Pofahl hired him to determine whether or not MDMA was a legal substance. *See* Supp. Record on Appeal, vol. 7, at 104-05. Key determined that MDMA was not illegal in the United States, but that it soon would be. *See id.* at 106, 112. As a result, Key and Charles Pofahl agreed to manufacture the drug in Guatemala, and Charles Pofahl promised to pay Key one million dollars for his assistance in

---

Title 21, section 963 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 963 (1988).

[11] *See* Supp. Record on Appeal, vol. 12, at 5.

manufacturing the MDMA. *See id.* at 112. Key and Charles Pofahl employed a number of other individuals to smuggle the MDMA into the United States. For example, in the summer of 1988 they arranged with Jerry Williamson to have half a million MDMA tablets carried to the United States from Guatemala by boat. *See id.* at 150-54. Other smugglers employed by Key and Charles Pofahl included Judy Snell, Charles Nunn, and Robert Petty. *See id.* vol. 9, at 680-86; *id.* vol. 10, at 867-72. Evidence of the agreements and overt acts of these individuals established the existence of a conspiracy to import MDMA.

Amy Pofahl's knowledge of, and voluntary participation in the conspiracy were also established by the evidence. Richard Cesarski testified at trial that he manufactured MDMA tablets for Charles Pofahl in Lewisville, Texas, and that Amy Pofahl was present at the time and was "counting [pills] and putting them in bottles."[12] *See id.* vol. 8, at 247. Morris Key testified that Amy Pofahl was present in an apartment in Guatemala where MDMA was being stored by Charles Pofahl. *See id.* vol. 7, at 148. Carlos de la Riva testified that he saw Amy Pofahl at the apartment where the MDMA was stored, and that she was helping Charles Pofahl remove "Made in

---

[12]     Because the events in Lewisville occurred in 1985, before MDMA became a controlled substance, Amy Pofahl's conduct on that occasion was not illegal. However, Cesarski's testimony establishes that in 1985 Amy Pofahl knew that her husband agreed with others to traffic in MDMA, and that she joined in the agreement by assisting with the packaging of MDMA tablets. That evidence, especially when considered in light of other evidence presented at trial, supports the conclusion that Amy Pofahl continued to take part in a conspiracy to traffic in MDMA after it became illegal.

Guatemala" labels from plastic bottles, which would then be used to package MDMA tablets for shipping to the United States. *See id.* vol. 8, at 281. Kathleen Key, Morris Key's ex-wife, testified that she was visited by Amy Pofahl in February of 1989, after Morris Key was arrested. *See id.* vol. 10, at 771. Pofahl was concerned about her husband and didn't know where he was. *See id.* at 772. Pofahl was also concerned about her money, but she told Key "that there was enough product in Guatemala to take care of everyone." *See id.* at 773-74.

Based on the foregoing evidence, the jury could have reasonably concluded that Pofahl knew of, and entered into the conspiracy to import MDMA. *See United States v. Mitchell*, 777 F.2d 248, 261 (5th Cir. 1985) (finding that evidence supported conviction for conspiracy to import drugs, where the defendant had knowledge of the origin of the drug shipments, participated in weighing and distributing the drugs, and collected and disbursed funds in connection with the importation), *cert. denied,* 476 U.S. 1184, 106 S. Ct. 2921, 91 L. Ed. 2d 549 (1986); *see also United States v. Rojas-Martinez*, 968 F.2d 415, 420-21 (5th Cir.) (finding circumstantial evidence sufficient to support conviction for conspiracy to import marijuana), *cert. denied,* ___ U.S. ___, 113 S. Ct. 828, 121 L. Ed. 2d 698 (1992); *United States v. Gibson,* 963 F.2d 708, 711 (5th Cir. 1992) (upholding conviction for importation of marijuana where circumstantial evidence))such as defendant's nervousness and inability to explain her unusual conduct))was

sufficient to support finding that defendant knew marijuana was present in side panel of her car).

The conspiracy to distribute and possess with intent to distribute MDMA involved additional participants and agreements. Larry Morrow was a friend of Amy Pofahl's who testified that he periodically purchased as many as two thousand tablets from Amy Pofahl. *See id.* vol. 9, at 594. When Amy Pofahl moved to California, she arranged for Morrow to begin receiving MDMA from her husband. *See id.* at 596. Morrow testified that he sold the MDMA to Sherry Wallingford, who was his "main distributor." *See id.* at 610-15. Pofahl concedes that this evidence was presented at trial, but she argues that the evidence was nonetheless insufficient to prove that she participated in the conspiracy. *See* Brief for Pofahl at 32 ("At most, the evidence shows that Mrs. Pofahl was acting as an independent dealer for the conspiracy."). Pofahl also contends that no evidence showed that she participated in negotiations or discussions concerning dealings in MDMA. However, those arguments fall short of demonstrating that the government's evidence was insufficient to support Pofahl's conviction. "[T]he trier of fact may infer agreement from circumstantial evidence." *Hernandez-Palacios,* 838 F.2d at 1348. Although some of the government's evidence may have been circumstantial, it was not therefore insufficient to support the jury's verdict. Consequently, we reject Pofahl's sufficiency claim.

**(iii)**

The evidence also supported the jury's conclusion that White was guilty of conspiracy to distribute and possess with intent to distribute MDMA. At trial Tom Drath testified that he had a meeting with Boyd Knight and Charles Wesley Knight, at which they discussed forming a partnership to sell MDMA. *See* Supp. Record on Appeal, vol. 8, at 404. Thereafter Drath began to receive large quantities of MDMA from Wes Knight,[13] which he sold to two "distributors" who were "underneath" him. *See id.* at 406-07. Drath testified that Randy White was one of those distributors, *see id.* at 407, and that White was assigned to him by Boyd Knight. *See id.* at 433. According to Drath, White carried a beeper, and Drath would call the beeper to let White know that a certain quantity of MDMA was waiting for him at a storage locker to which White had a key. *See id.* at 410-11. White would retrieve the drugs and sell them, and then pay Drath for the drugs by placing part of the proceeds from his sales back in the locker. *See id.* Drath stated that he distributed over 100,000 tablets to White between October of 1987 and December of 1988. *See id.* at 406, 425, 428.

Internal Revenue Service Special Agent Gary Terrell testified at trial and recounted an interview with White. White stated to Terrell that he entered into an agreement with Tom Drath to purchase two to three thousand tablets of MDMA per week. *See id.* at 440. White also told Terrell that he had distributors to whom

---

[13]     Wes Knight received MDMA directly from Morris Key. *See* Supp. Record on Appeal, vol. 7, at 144.

he resold the MDMA which he received from Tom Drath. *See id.* at 440-42. These distributors included Shawn Guillory, Sandy Paulas, Gary Strauss, and Chris Edwards. *See id.* White told Terrell that at one time he accumulated $75,000 in proceeds from sales of MDMA. *See id.* at 448. This evidence reveals a number of agreements entered into by White for the sake of trafficking in MDMA, and amply proves that White knew of, and participated in a conspiracy to distribute and to possess with intent to distribute MDMA.

White points out that he did not know the top-level organizers of the conspiracy, such as Charles Pofahl and Morris Key. However, in order for White to be convicted of conspiracy it was not necessary for the government to prove that he knew all of the members of the conspiracy. In *Blumenthal v. United States*, 332 U.S. 539, 68 S. Ct. 248, 92 L. Ed. 154 (1947), Blumenthal was convicted of conspiracy to sell whiskey at a price in excess of the price set by the government. *See id.* The Supreme Court found the evidence sufficient to support Blumenthal's conviction, even though Blumenthal had no knowledge of the identity or participation of the individual who actually owned the whiskey, *see id.* at 556-57, 68 S. Ct. at 256:

> [I]t is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections

-19-

with it, without requiring evidence of knowledge of all its details or of the participation of others.

*Id.* The evidence here amply demonstrated the essential nature of the conspiracy))a network of agreements to traffick in MDMA))as well as White's participation in the conspiracy. The government was not required to prove that White knew the top-level organizers of the conspiracy. *See id.; United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (en banc) (citing *Blumenthal*), *cert. denied,* 451 U.S. 938, 101 S. Ct. 2017, 68 L. Ed. 2d 324 (1981).

White also contends that he dealt in MDMA while it was legal in the United States, but withdrew from the conspiracy "shortly" after MDMA became a controlled substance. We disagree. Although it appears that White began dealing in MDMA before it was illegal to do so, he continued to traffick in the contraband long afterwards. The record reveals that MDMA became a controlled substance on October 27, 1986. *See* Supp. Record on Appeal, vol. 10, at 949. The record also reveals that White was still trafficking in MDMA as late as December of 1988, more than two years after it became a controlled substance. *See id.* vol. 8, at 446. The evidence was sufficient to support White's conviction for conspiracy to distribute and possess with intent to distribute MDMA.

### III

#### *Amy Ralston Pofahl*

#### A

Pofahl makes several claims concerning her motion for appointment of a psychiatrist to assist in preparing and presenting

her defense, pursuant to 18 U.S.C. § 3006A (1988).[14]  Pofahl's trial counsel, John Hurley, filed in the district court Pofahl's Ex Parte Motion for Appointment of Defense Psychiatric Consultant, "respectfully request[ing] the Court to appoint Dr. Stephen Mark, a licensed psychiatrist, as a defense consultant pursuant to 18 U.S.C. § 3006A(e)."  *See* Record on Appeal, vol. 1, at 313 (sealed). The motion stated that a psychiatric consultant was needed for the following reasons:

> The contents of some of [Pofahl's] writings express strong beliefs in ideas such as reincarnation and the channeling of spirits.  While these beliefs may not in themselves be evidence of mental unsoundness, the sheer volume of writing produced by [Pofahl], her supposed easy access to hallucinogenic drugs, and her steadfast rejection of any suggestion to reduce her potential penal exposure by plea bargaining create a need for [Pofahl] to be examined by a psychiatric expert, and for this attorney to consult with said expert in order to adequately represent [Pofahl], and investigate all possible defenses available to [her], and to determine whether [she] is unable to properly assist in her defense because of mental disease or defect.

*Id.*

The district court entered an order without conducting a hearing or otherwise taking evidence concerning the merits of Pofahl's motion.  *See id.* at 324.  The district court found "that

---

[14]     Section 3006A provides:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application.  Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e) (1988).

a psychiatrist should be appointed to examine [Pofahl] and to determine her present competency to stand trial and her sanity at the time of the offense." *Id*.  The district court appointed Dr. Stephen Mark to conduct the examination, and ordered him to prepare a written report of his findings.  The district court directed Dr. Mark to forward copies of his report to the prosecutor.

Dr. Mark met with Pofahl and thereafter forwarded to all concerned parties a one-page letter which contained the following description of the meeting:

> [Pofahl] basically told me that she did not want to talk to me.  She did say that she faces lots of years in prison and because of the way things have gone she is not sure who to trust and who not to trust.  She did tell me that she has never been in a psychiatric facility nor has she been under psychiatric care or on psychiatric-type medications.  The very little bit that she did talk, I could not pick up any reason to believe that she would not be competent to stand trial, although, certainly before I come to that conclusion, I typically like to ask a lot more questions and get responses to questions than what I was able to ask today.

*Id*. (letter of Stephen L. Mark, M.D., Sept. 16, 1991).  Pofahl's counsel, Mr. Hurley, made no objection to the district court's handling of Pofahl's motion, and made no further attempts to obtain psychiatric assistance or to present a defense of insanity.

**(i)**

Pofahl argues that the district court committed reversible error by denying her motion[15] without first conducting an ex parte

---

[15]    The district court effectively))though not expressly))denied Pofahl's motion.  The psychiatric examination ordered by the district court was neither requested by Pofahl nor authorized by § 3006A(e).  "The expert appointed under § 3006A . . . is intended to serve the interests of the defendant. . . . `His conclusions need not be reported to either the court or the

inquiry to determine whether she was entitled to the relief requested. When a criminal defendant moves under § 3006A(e) for psychiatric expert assistance, the district court is required to conduct an ex parte inquiry to determine whether the requested relief is appropriate. *See United States v. Hamlet*, 456 F.2d 1284, 1284 (5th Cir. 1972) (holding that the district court "erred in denying the § 3006A(e) motion without conducting the ex parte inquiry required by the statute"); *United States v. Theriault*, 440 F.2d 713, 715 (5th Cir. 1971) (same). However, the district court's failure to conduct the inquiry required by § 3006A(e) does not automatically warrant reversal in this case. Where, as here, a party fails to object to an alleged error before the district court, we generally will not disturb the district court's ruling, unless plain error is shown. *See, e.g., United States v. Surasky*, 974 F.2d 19, 20 (5th Cir. 1992) (holding that plain error standard applied where criminal defendant failed to object to allegedly erroneous application of the sentencing guidelines); *United States v. Lopez*, 923 F.2d 47, 49-51 (5th Cir.) (declining to review the merits of appellant's sentencing guidelines claim, where the alleged error was not raised at trial, and no plain error was found), *cert. denied*, ___ U.S. ___, 111 S. Ct. 2032, 114 L. Ed. 2d 117 (1991). Plain error is "error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of [the] judicial proceedings" and would "result

---

prosecution.'" *United States v. Chavis*, 476 F.2d 1137, 1142 (D.C. Cir. 1973) (quoting *United States v. Theriault*, 440 F.2d 713, 715 (5th Cir. 1971)).

in manifest injustice." *Lopez*, 923 F.2d at 50; *see also United States v. Bi-Co Pavers*, 741 F.2d 730, 735 (5th Cir. 1984); *United States v. Howton*, 688 F.2d 272, 278 (5th Cir. 1982).

We have not previously applied the plain error standard where a criminal defendant failed to object to the district court's failure to conduct the ex parte inquiry required by 18 U.S.C. § 3006A(e). Neither *Hamlet* nor *Theriault* mentioned whether the defendant made an objection. However, we now choose to follow the Tenth Circuit in applying the plain error standard in this context. *See United States v. Greschner*, 802 F.2d 373, 380 (10th Cir. 1986) (applying plain error standard where defendant failed to object to the presence of government attorneys at hearing on § 3006A(e) motion for appointment of penologist), *cert. denied,* 480 U.S. 908, 107 S. Ct. 1353, 94 L. Ed. 2d 523 (1987).

Pofahl has not shown plain error resulting from the district court's failure to conduct an ex parte inquiry. Pofahl would have been prejudiced by that alleged error only if it had prevented the presentation of a meritorious defense of insanity, and nothing in the record suggests that Pofahl suffered from any mental disease or defect which would have supported an insanity defense. The only items in the record which bear on Pofahl's sanity are the allegations in her Ex Parte Motion for Appointment of Defense Psychiatric Consultant. Mr. Hurley alleged that Pofahl's writings revealed her belief in reincarnation and the channeling of spirits, but he conceded that these beliefs "may not in themselves be evidence of mental unsoundness." *See* Record on Appeal, vol. 1, at

313 (sealed). Counsel also alleged that Pofahl had "easy access to hallucinogenic drugs," but did not allege that Pofahl had ever used such drugs, or that she was impaired by their use at the time of the offense. *See id*. Finally, counsel alleged that Pofahl refused to consider a plea bargain. *See id.* While that choice may have been unwise, it is hardly symptomatic of a mental disease or defect. In sum, nothing in the record suggests that Pofahl could have presented a successful defense of insanity. Consequently, we find no plain error in the district court's failure to conduct an ex parte inquiry.

### (ii)

Pofahl also argues that her conviction should be reversed because she was denied her Sixth Amendment right to effective assistance of counsel. Pofahl argues that her trial attorney was ineffective for failing to object to the district court's disposition of her § 3006A(e) motion. We reject Pofahl's argument, because she has not shown that, in the absence of her counsel's failures, the outcome of her trial probably would have been different.

In order to prevail on her claim of ineffective assistance of counsel, Pofahl must show that (1) her counsel's performance was deficient, and (2) the deficient performance prejudiced her defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). We agree that counsel's performance in this case was deficient. In *United States v. Edwards*, 488 F.2d 1154 (5th Cir. 1974), a case presenting facts

very similar to these, we held that counsel's performance was ineffective.  In *Edwards* a motion was filed under § 3006A(e), and the district court ordered a psychiatric examination.  *See id.* at 1159.  After performing the examination, the psychiatrist reported his findings to the prosecution as well as the defense.  *See id.* As in the instant case, defense counsel failed to object, and we held that Edwards did not receive "counsel reasonably likely to render and rendering reasonably effective assistance."  *See id.* at 1162, 1165.  In light of *Edwards* we conclude that Pofahl's counsel's performance was deficient.

However, Pofahl is not entitled to reversal unless she demonstrates that her defense was prejudiced by her attorney's errors.  To demonstrate prejudice, Pofahl must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.  Pofahl was prejudiced by counsel's errors only if those errors stopped her from presenting a meritorious defense of insanity.  As discussed in the preceding section, the record reveals no basis for such a defense.  Therefore Pofahl has not shown that, but for counsel's unprofessional performance, the outcome of her trial probably would

have been different.[16]   Accordingly, we find no merit to Pofahl's ineffective assistance of counsel claim.

### (iii)

Pofahl further argues that "the district court, having itself raised the issue of Mrs. Pofahl's competency,[17] erred in failing to conclusively determine whether in fact Mrs. Pofahl was competent at the time of offense and at the time of trial."  Brief for Pofahl at 15.  Pofahl contends that Dr. Mark's examination was inconclusive, and therefore the district court erroneously failed to resolve the issue which it raised.  Pofahl did not object below to the district court's alleged failure to determine whether she was competent.  Consequently, absent a showing of plain error, Pofahl is not entitled to relief.  For the reasons stated previously, *see supra* III.A.(i)., Pofahl has not shown plain error.  Pofahl does not allege that she was ever mentally incompetent, and nothing in the record would support such an allegation.  Consequently, we reject Pofahl's argument.

### B

---

[16]    *Edwards* is distinguishable in this regard.  It appears that Edwards was prejudiced by his attorney's failure to pursue the insanity defense because Edwards was diagnosed as "`an immature personality' exhibiting `simple schizophrenia with depression, sociopathic tendencies, religiosity and passive dependent features.'"  *Edwards*, 488 F.2d at 1159.  Consequently, there was a reasonable probability that Edwards could have presented a meritorious insanity defense, if not for his counsel's omissions.

[17]    Pofahl argues that the district court raised the issue of her competency by ordering Dr. Mark to conduct a psychological evaluation.

Pofahl next argues that the district court erred by denying her motion to suppress evidence seized from three of her residences in California. Law enforcement officers obtained search warrants for the following three locations: 8488 Carlton Way, Los Angeles; 8447 West 4th Street, Los Angeles; and 17 Yawl Street, Marina Del Rey. Pofahl argues that the affidavits supporting the warrants did not establish probable cause. According to Pofahl, the affidavits alleged that her husband, Charles Pofahl, and Dr. Morris Key engaged in criminal activities in Texas, but failed to allege that she engaged in any illegal conduct or that any illegal conduct took place in California. Pofahl contends that the affidavits therefore did not establish a nexus between her residences in California and the evidence sought there by officials.

Where a district court denies a motion to suppress evidence seized pursuant to a warrant, and the motion is premised on an alleged lack of probable cause to support the warrant, we review the denial of the motion to determine (1) whether the good-faith exception to the exclusionary rule applies, *see United States v. Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); and (2) whether the warrant was supported by probable cause. *United States v. Satterwhite,* 980 F.2d at 317, 320 (5th Cir. 1992); *see also United States v. Webster,* 960 F.2d 1301, 1307 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 355, 121 L. Ed. 2d 269 (1992). However, it is unnecessary to address the probable cause issue if the good-faith exception applies, unless the case involves a "`novel question of law whose resolution is necessary to guide

-28-

future action by law enforcement officers and magistrates.'" *Illinois v. Gates,* 462 U.S. 213, 264, 103 S. Ct. 2317, 2346, 76 L. Ed. 2d 527 (1983)(White, J., concurring); *Satterwhite,* 980 F.2d at 320 (quoting *Gates*). Because Pofahl's Fourth Amendment argument does not present a novel question of law, we address the good-faith issue first.

Evidence obtained by officers in objectively reasonable good-faith reliance upon a search warrant is admissible, even though the warrant was unsupported by probable cause. *See Leon,* 468 U.S. at 922-23, 104 S. Ct. at 3420; *Satterwhite,* 980 F.2d at 320. The evidence is not admissible where the warrant is based upon an affidavit "`so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon*, 468 U.S. at 923, 104 S. Ct. at 3421 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-611, 95 S. Ct. 2254, 2265-66, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring in part)). We often refer to an affidavit of that sort as a "bare bones affidavit."[18] *See United States v. Craig,* 861 F.2d 818, 821 (5th Cir. 1988). Where a warrant is supported by more than a bare bones affidavit, an officer may rely in good faith on the warrant's validity. *Satterwhite*, 980 F.2d at 321; *United States v. Pigrum,* 922 F.2d 249, 252 (5th Cir.), *cert. denied,* ___ U.S. ___, 111 S. Ct. 2064, 114 L. Ed. 2d 468 (1991). We review de novo the reasonableness of an officer's reliance upon

---

[18] A bare bones affidavit contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Satterwhite,* 980 F.2d at 321.

a warrant issued by a magistrate. *Satterwhite,* 980 F.2d at 321 (citing *United States v. Wylie,* 919 F.2d 969, 974 (5th Cir. 1990)).

**(i)**

The search warrant for 8488 Carlton Way in Los Angeles was supported by the affidavit of Internal Revenue Service Special Agent Michel L. Lamberth. *See* Record on Appeal, vol. 2, at 232-53. The affidavit described at length how Charles Pofahl and Morris Key obtained chemicals in West Germany, shipped them to Guatemala for use in the manufacture of MDMA, and then imported the MDMA tablets into the United States for sale. Most of the criminal activities discussed in the affidavit involved Charles Pofahl and Morris Key, but not Amy Pofahl. However, a confidential informant ("CI-3") told Lamberth "that Amy Pofahl was fully knowledgeable and heavily involved with Charles F. Pofahl's personal and business activities." *Id*. at 234-35. Another confidential informant ("CI-5") stated that, following the arrest of Charles Pofahl in April of 1989, "Amy Pofahl [had] taken charge of the business and personal effects of Charles F. Pofahl." *See id*. at 234.

Prior to Charles Pofahl's arrest, he and Amy Pofahl resided at 12526 Sunlight Drive in Dallas. *See id*. at 243. Confidential informant CI-3 stated that he maintained an office at Charles Pofahl's residence and was once a business partner of Charles Pofahl. *See id.* at 244. CI-3 stated that he had seen "numerous filing cabinets containing records relating to the manufacture of pharmaceutical products . . . at Pofahl's residence located at 12526 Sunlight." *See id*. at 243. CI-3 said that additional

records were kept at an office at 3317 Finley, in Irving. *See id.* CI-3 further reported that Charles Pofahl kept a safe at his Dallas residence, which contained "large amounts of currency, jewelry, coins, firearms, and plastic bags containing white powder and tablets." *See id*.

Around the time of Charles Pofahl's arrest, Amy Pofahl vacated the residence in Dallas. *See id*. at 243. A neighbor of the Pofahls reported seeing furniture being loaded into a moving van at 12526 Sunlight Drive in April of 1989. *See id.* at 234. Amy Pofahl told the neighbor that she was moving to California. *See id*. CI-5 reported that, following Charles Pofahl's arrest, he assisted Amy Pofahl by transporting office equipment, books, and records pertaining to Charles Pofahl's business from an office at 3317 Finley, in Irving, to a storage facility in Dallas. *See id*. at 241. CI-5 also stated that he helped Amy Pofahl move boxes of documents to the same storage facility from the Pofahls' house on Sunlight Drive around the same time. *See id*. Lamberth searched the storage facility and found what he believed to be only part of the Pofahls' business and financial records. *See id*. at 238. At the time of Lamberth's affidavit, the whereabouts of the safe referred to by CI-3 were unknown. *See id.* at 242.

Utility company records revealed that Amy Pofahl obtained utility services for 8488 Carlton Way in Los Angeles on April 12, 1989, *see id*. at 235-36, and Pacific Bell Telephone listed a number for Amy Ralston (Pofahl's maiden name) at 8488 Carlton Way. *See id*. at 235. A Drug Enforcement Administration ("DEA") agent told

Lamberth that he had seen a woman matching Amy Pofahl's description at the 8488 Carlton Way residence.  *See id.*

Citing *United States v. Green*, 634 F.2d 222 (5th Cir. 1981), Pofahl argues that the foregoing information did not support an objectively reasonable good faith belief in probable cause because it did not allege that Pofahl engaged in any criminal activity in California.  In *Green*, law enforcement officers obtained a search warrant for Green's Florida residence.  *See id*. at 226.  The affidavits supporting the warrant amply demonstrated that Green was involved in criminal activities in California, "[b]ut no evidence, other than residence, was set forth in the affidavits that connected the Key West, Florida, home to the criminal activity taking place almost 3,000 miles away."  *See id*. at 225-26.  On appeal the question was "whether evidence that a person is engaged in criminal conduct in California constitutes probable cause, in and of itself, to search that person's Florida residence." *See id.* at 226.  We answered that question in the negative:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.  In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.  But we are confronted with a different situation:  in this case defendant Green allegedly engaged in criminal activity several thousand miles from his residence.  The convenience of the residence for use as a place to plan and hide fruits of the crime is thus diminished, if not eliminated.

*Id.*  Under those circumstances we found "no justification for a reasonable person to conclude that there was probable cause to

-32-

believe that fruits or instrumentalities of crimes could be found at the Florida residence." *Id*. Pofahl argues that, in light of *Green*, Lamberth's allegations of criminal conduct in Texas did not support a reasonable good faith belief in probable cause to search Pofahl's residence in California. We disagree.

In *Green* the only support for probable cause was the assumption that, because it is usually convenient for criminals to keep the fruits and instrumentalities of their crimes at home, Green would do so as well. Here the search warrant was supported by specific, concrete facts, rather than a mere assumption about the tendencies of criminals to keep evidence of their crimes at home. The facts alleged by Lamberth showed that Amy and Charles Pofahl stored records and fruits of their criminal enterprise at their residence, and that Amy Pofahl moved from Sunlight Drive in Dallas to 8488 Carlton Way in Los Angeles after she took control of the drug trafficking business. Therefore, it was reasonably inferable that Amy Pofahl had the records, fruits, and instrumentalities of the Pofahls' crimes transported to California and stored at her residence.[19] *See United States v. Thomas*, 973 F.2d 1152, 1157 (5th Cir. 1992) ("Since [the] criminal instruments were not found at Thomas's . . . business, the expectation of

_____

[19]    When Amy Pofahl moved to California, she removed from the house in Dallas any records and fruits of the criminal enterprise; she also removed business records and equipment from the office in Irving. Some of these items were transported to a storage facility in Dallas, but Lamberth concluded that the business records discovered there were only part of the records pertaining to the Pofahls' drug smuggling operation. Lamberth did not indicate that the search of the storage facility revealed any of the items mentioned by CI-3 as the contents of Charles Pofahl's safe.

finding the [criminal instruments] at Thomas's home was a reasonable inference supporting a determination of probable cause."); *United States v. Pace*, 955 F.2d 270, 277 (5th Cir. 1992) (noting that nexus between evidence sought and location to be searched "may be established `through normal inferences as to where the articles sought would be located'" (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982))). In *Green* "[w]e emphasize[d] that the affidavits contain[ed] no allegations tending to establish that criminal activity of any kind was taking place at the Florida residence." *Green,* 634 F.2d at 226 n.8. Because the affidavit at issue here contained substantially greater indicia of probable cause than did the affidavit in *Green*, Pofahl's reliance on that case is misplaced.

Lamberth's affidavit was not a bare bones affidavit containing only "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *See Satterwhite*, 980 F.2d at 321. The specific facts alleged by Lamberth tended to establish the existence of an ongoing criminal enterprise, as well as the likelihood that evidence of that enterprise would be found at Pofahl's California residence. Therefore, the officers reasonably relied in good faith on the search warrant for the house at 8488 Carlton Way, and the district court did not err by admitting evidence seized at that residence.

**(ii)**

Amy Pofahl apparently moved to 8447 West 4th Street in Los Angeles in April of 1990.[20] A search warrant was issued for that address in July. DEA Special Agent Douglas Cortinovis was the affiant in support of the warrant. Cortinovis alleged numerous facts which indicated that Pofahl was actively involved in the importation and distribution of MDMA along with Charles Pofahl and Morris Key. For example, Cortinovis stated that he had interviewed Morris Key at a federal prison, and that Key reported seeing Amy Pofahl carrying 10,000 MDMA tablets in the trunk of her car. *See* Record on Appeal, vol. 2, at 216, 219. Cortinovis also interviewed Charles Pofahl in a German prison, at which time Charles Pofahl stated that Amy Pofahl had full knowledge of his drug business, and even assisted in tableting and packaging MDMA and counting currency acquired through sales of MDMA. *See id.* at 210-11. Charles Pofahl admitted that he and his associates were involved in the importation and distribution of MDMA from 1985 to 1989. *See id*. at 220. Cortinovis stated, based on his experience investigating crimes of this kind, that individuals who participate in drug trafficking maintain records and other evidence of their illegal activities at their residences for long periods of time, often months or years. *See* Record on Appeal, vol. 2, at 222-24.

---

[20] In March of 1990 Pofahl's landlords at 8488 Carlton Way told an IRS investigator that Pofahl was terminating her tenancy that month. *See* Record on Appeal, vol. 2, at 202. Pofahl began receiving phone service at 8447 West 4th Street in April of 1990. *See id.* Water, gas, and electric services for that address were registered in Pofahl's name as well. *See id.*

Pofahl presses essentially the same arguments with respect to the search warrant for her West 4th Street apartment as she did with respect to the warrant for the Carlton Way residence. Pofahl's argument under *Green* is even less persuasive here. In addition to demonstrating Pofahl's extensive involvement in the MDMA business, Cortinovis alleged specific facts tending to show that Pofahl continued to be involved with MDMA after she moved to California. At the 8488 Carlton Way residence, officers seized Pofahl's Mercedes Benz, which contained half a dozen MDMA tablets. *See id*. at 205. Long distance telephone records also indicated that Pofahl kept in touch with Larry Morrow, a major participant in Charles Pofahl's MDMA operation,[21] while she was living in the house on Carlton Way. *See id*. at 204. Because the facts alleged in Cortinovis's affidavit do not pertain only to Texas, Pofahl's reliance on *Green* is again misplaced.

Many of the facts alleged by Cortinovis concerning Amy Pofahl's involvement in the MDMA trafficking scheme occurred before she moved from Carlton Way to West 4th Street. Therefore, Pofahl argues, the facts alleged by Cortinovis had little if anything to do with the West 4th Street location, and did not justify admission of evidence seized at that location. We disagree.

First, facts alleged by Cortinovis tend to show that after Amy Pofahl moved to the apartment on West 4th Street, she regularly communicated with Jerry Williamson, the individual who was

---

[21] Cortinovis alleged that Larry Morrow participated in Charles Pofahl's operation as a smuggler and as a regular distributor of MDMA. *See id.* at 210.

responsible for smuggling the majority of Charles Pofahl's MDMA into the United States from Guatemala. *See id.* at 204. Williamson stated, during a post-arrest interview, that Amy Pofahl contacted him to warn him that Charles Pofahl was cooperating with the authorities and might be revealing incriminating information about him. *See id.* Long distance telephone records indicated that Williamson called Amy Pofahl's residence several times each month during the first few months that she lived at the West 4th Street address. *See id.*

Second, Pofahl's argument has little weight in light of our decision in *United States v. Webster*, 960 F.2d 1301 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 355, 121 L. Ed. 2d 269 (1992). Webster argued that evidence seized at his residence should have been suppressed because the affidavit supporting the search warrant failed to establish probable cause. *See id.* at 1306. The affidavit alleged that Webster sold drugs at his residence 18 months before the issuance of the warrant. *See id.* The more recent drug sales alleged in the affidavit occurred at other locations. *See id.* at 1307. We affirmed the district court's admission of the seized evidence, under the *Leon* good-faith exception:

> The affidavit alleged that, based on the officer's experience, drug dealers and traffickers commonly keep caches of drugs, as well as paraphernalia and records of drug transactions, in their residences. In other words, the basis for searching Webster's residence was his overall drug trafficking and sales activity, not just those sales that actually took place at his residence.

*See id.* The same can be said here.

Agent Cortinovis did not submit a bare-bones affidavit. Cortinovis alleged facts tending to show that Amy Pofahl's involvement in a long-standing drug trafficking operation continued into the period when she lived at the apartment on West 4th. Cortinovis also pointed out that participants in drug trafficking enterprises are likely to keep records and other evidence of their illegal activities at their homes for long periods of time. Therefore, we conclude that the facts alleged by Cortinovis supported a reasonable good faith belief in probable cause.[22] The district court did not err by admitting evidence seized at 8447 West 4th Street.

**(iii)**

Law enforcement officers executed a search warrant for Pofahl's residence at 17 Yawl Street, Unit #4 in Marina Del Rey on March 27, 1991. Internal Revenue Service Special Agent Gary Gallman submitted an affidavit in support of the search warrant application. Gallman alleged that Charles Pofahl and Morris Key's MDMA racketeering operation persisted for several years and involved the importation and distribution of millions of MDMA tablets. *See* Record on Appeal, vol. 2, at 185-86. Gallman

---

[22] *See also United States v. Kleinebreil*, 966 F.2d 945 (5th Cir. 1992). There we upheld the admission of evidence under the *Leon* good faith exception, even though evidence relating directly to the residence searched was a year old. *See id.* at 948-49. We concluded that the affidavit "`clearly show[ed] a long-standing, ongoing pattern of criminal activity,' *continuing through the date of issuance of the warrant*," and "the type of evidence sought))records of drug-trafficking activity))`[was] of the sort that [could] reasonably be expected to be kept for long periods of time in the place to be searched.'" *See id.* at 949 (quoting *United States v. Craig*, 861 F.2d 818, 822-23 (5th Cir. 1988)).

referred to an interview with Morris Key, during which Key stated that Amy Pofahl had full knowledge of the MDMA operation, and that he had seen her carrying about 10,000 MDMA tablets in the trunk of her car. *See id.* at 183. Charles Pofahl also stated that Amy Pofahl knew about, and assisted him with, the production, importation, and distribution of MDMA. *See id*. at 181. Gallman alleged facts which tended to show that, after the arrest of Charles Pofahl in Germany, Amy Pofahl removed large sums of cash from various storage facilities in the Dallas area and transported the money, or had it transported, to California. *See id*. at 174, 177-79. Other facts alleged by Gallman indicate that Amy Pofahl placed at least some of the currency in storage facilities in California. *See id.* at 173. Gallman recounted an interview with an individual named Robert Petty, who stated that he had sold MDMA for Amy Pofahl and delivered the proceeds ($218,930) to her while she was living in Los Angeles. *See id*. Dean Bornstein and Heather Teague were friends of Amy Pofahl, who claimed that Pofahl provided them with MDMA for their personal use during 1989 and 1990. *See id.* at 173-74. Gallman also alleged facts tending to show that Amy Pofahl, while living in California, maintained contact with Jerry Williamson, who had been primarily responsible for importing Charles Pofahl's MDMA into the United States from Guatemala. *See id*. at 175-76. Finally, when Amy Pofahl was arrested on March 26, 1991))the day before the search of the Yawl Street residence))the arresting officers asked her where her money was hidden. *See id.*

at 170-71. Pofahl asked the officers whether they "would let her go free if she gave up her money." *See id.* at 170.

Agent Gallman did not submit a bare-bones affidavit. The specific facts alleged by Gallman tended to show that Amy Pofahl had been involved in an elaborate, longstanding MDMA trafficking operation, and that she continued to be involved with the operation, or at least some facets of it, after she moved to California. Because Amy Pofahl utilized storage facilities in California, it was likely when the Yawl Street warrant was issued that evidence of drug trafficking, particularly the proceeds of drug sales, had not been seized at either of Amy Pofahl's residences in Los Angeles and remained in her hands. That conclusion would have been bolstered by Amy Pofahl's offer to the arresting officers to hand over her money in return for her freedom. These facts supported a reasonable good faith belief in probable cause to search the Yawl Street residence. *See Kleinebreil*, 966 F.2d at 949; *Webster*, 960 F.2d at 1307. The district court did not err by admitting evidence seized at the Yawl Street location.[23]

---

[23] Randy White claims that his conviction must be reversed because certain evidence admitted at trial was unconstitutionally seized from Amy Pofahl's Jaguar automobile outside the Yawl Street residence in Marina del Rey. Because White has no standing to object to the search, his argument fails. An individual who has no reasonable expectation of privacy in a vehicle lacks standing to challenge a search of that vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 148, 99 S. Ct. 421, 433, 58 L. Ed. 2d 387 (1978); *United States v. Johnston*, 685 F.2d 934, 939 (5th Cir. 1982) (citing *Rakas*). We have found that an individual lacks standing to object to the search of a vehicle where he asserts no ownership interest in the vehicle. *See United States v. Harrison*, 918 F.2d 469, 472 (1990) (citing *Rakas* and *Johnston*); *Johnston*, 685 F.2d at 939.

Pofahl also contends that the district court erred by calculating her sentence on the basis of the full amount of MDMA involved in the conspiracy))1.4 million grams. Pofahl argues that it was not reasonably foreseeable to her that the conspiracy would involve such a large quantity of MDMA, and therefore the district court should not have taken that amount of drugs into account in determining her base offense level for the drug conspiracy counts.[24] The district court assigned Pofahl a base offense level of 38 based on 1.4 million grams of MDMA.[25] Pofahl failed to object to the amount of MDMA used to calculate her base offense level. *See* Letter from Attorney John M. Hurley to U.S. Probation Officer William H. Moore, attached to Presentence Report, United States of America v. Amy Ralston Pofahl, No. W-91-CR-038 (Pofahl's objections

---

White concedes that he "did not know . . . Pofahl and knew nothing of her residence in Marina del Rey, California or her automobile." Brief for White at 15. Clearly White lacks standing to contest the search of that automobile.

[24] A defendant's base offense level is determined on the basis of:

[A]ll acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense . . . .

United States Sentencing Commission, *Guidelines Manual*, § 1B1.3(a)(1) (Nov. 1991). "Conduct `for which the defendant would be otherwise accountable' . . . includes conduct of others in furtherance of the execution of [a] jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n.1).

[25] *See* Presentence Report, United States of America vs. Amy Ralston Pofahl, No. W-91-CR-038, at 22 (sealed); Supp. Record on Appeal, vol. 12, at 20 (applying offense level recommended by probation officer).

to Presentence Report); Supp. Record on Appeal, vol. 12 (Pofahl's sentencing hearing). Because Pofahl failed to object below, the district court's ruling will be reviewed only for plain error. *See United States v. Hatchett*, 923 F.2d 369, 376 (5th Cir. 1991) (applying plain error standard where defendant failed to object to district court's consideration of a quantity of cocaine in calculating his base offense level). Plain error is "error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of [the] judicial proceedings" and would "result in manifest injustice." *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.), *cert. denied*, ___ U.S. ___, 111 S. Ct. 2032, 114 L. Ed. 2d 117 (1991) (citations omitted); *see also United States v. Bi-Co Pavers*, 741 F.2d 730, 735 (5th Cir. 1991); *United States v. Howton*, 688 F.2d 272, 278 (5th Cir. 1982).

We find no plain error here. "Questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error." *Lopez*, 923 F.2d at 50. The quantity of drugs reasonably foreseeable to Pofahl is a question of fact which the district court could have resolved at sentencing. *See United States v. Cockerham*, 919 F.2d 286, 289 (5th Cir. 1990) (holding that determination of relevant conduct under § 1B1.3 is "primarily factual"); *United States v. Rivera*, 898 F.2d 442, 445 (5th Cir. 1990) (holding that quantity of drugs implicated by a crime is a factual question).

In the alternative, we find no plain error in holding Pofahl accountable for the full amount of MDMA involved in the conspiracy

because it appears that the full amount of MDMA was reasonably foreseeable to Pofahl. Evidence presented by the prosecution revealed that Pofahl was personally involved in several aspects of her husband's MDMA business, practically from the inception of the conspiracy, and that she knew or should have known of the large quantities of MDMA that were involved in the conspiracy. Before the manufacturing operation was moved to Guatemala, Amy Pofahl assisted in counting MDMA tablets and placing them in bottles in Lewisville, Texas. *See* Supp. Record on Appeal, vol. 8, at 247. Pofahl was also present in Guatemala at the apartment where Charles Pofahl stored MDMA before importing it into the United States, and she helped him to remove the "Made in Guatemala" labels from bottles that were used to package the MDMA. *See id.* vol. 7, at 148; vol. 8, at 281. Charles Pofahl stated to law enforcement officers that Amy Pofahl had full knowledge of his manufacturing, importation, and distribution activities, and that she frequently assisted him in counting large quantities of currency received in exchange for MDMA. *See* Record on Appeal, vol. 2, at 181 (affidavit of IRS Special Agent Gary Gallman in support of search warrant).[26]

---

[26] In determining Pofahl's sentence, the district court could consider information included in the sworn affidavits of law enforcement officers. *See* 18 U.S.C. § 3661 (1988) ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); United States Sentencing Commission, *Guidelines Manual*, § 1B1.4 (Nov. 1991); *United States v. Patterson*, 962 F.2d 409, 415 (5th Cir. 1992) ("The district court is free to consider all relevant evidence [at sentencing])even inadmissible evidence))as long as the evidence relied upon has `sufficient indicia of reliability to support its probable accuracy.'" (quoting *United States v. Alfaro*, 919 F.2d

A confidential informant reported that, after Charles Pofahl's arrest, Amy Pofahl took charge of Charles Pofahl's "business and personal effects." *See id.* at 234 (affidavit of IRS Special Agent Michael Lamberth in support of search warrant). Amy Pofahl's knowledge of the large quantity of MDMA involved in the conspiracy was also evident from a conversation with Morris Key's wife, Kathleen Key, soon after Morris Key's arrest. *See* Supp. Record on Appeal, vol. 10, at 771-74. Pofahl stated that she did not know where her husband was, and she was concerned about her money, but "that there was enough product in Guatemala to take care of everyone." *See id.* at 772-74. The district court's consideration of 1.4 million grams of MDMA did not amount to plain error.

**D**

Pofahl also contends that the district court erred in increasing her offense level by two, based upon its finding that she was a manager of the conspiracy.[27] *See* Supp. Record on Appeal, vol. 12, at 7; United States Sentencing Commission, *Guidelines Manual*, § 3B1.1(c) (Nov. 1991). The district court's factual finding that Pofahl was a manager of the conspiracy will not be reversed absent a showing of clear error. *See United States v.*

---

962, 965 (5th Cir. 1990))).

[27] The term "manager" is not defined by the Sentencing Guidelines. *See* U.S.S.G. § 3B1.1 and comment. As that term has been applied in this Circuit, it implies, *inter alia,* recruitment of participants in the offense, the exercise of control over others, and the exercise of decision-making authority. *See United States v. Peters*, 978 F.2d 166, 170 (5th Cir. 1992); *United States v. Liu*, 960 F.2d 449, 456 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 418, 121 L. Ed. 2d 341 (1992).

*Mueller*, 902 F.2d 336, 345 (5th Cir. 1990); *United States v. Alvarado*, 898 F.2d 987, 993 (5th Cir. 1990). We will not deem the district court's finding to be clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed. *See Alvarado*, 898 F.2d at 993-94.

The district court's characterization of Pofahl as a manager was not clearly erroneous. On several occasions Pofahl influenced the course of the drug trafficking operation or exercised authority over others in furtherance of the conspiracy. Pofahl was responsible for introducing Larry Morrow into the conspiracy. *See* Supp. Record on Appeal, vol. 9, at 593. Morrow was first introduced to Charles Pofahl by Amy Pofahl, and for some time she personally supplied Morrow with MDMA for resale and for his personal use. *See id.* at 593-94. Amy Pofahl negotiated with Morrow regarding the price that he would pay her for the MDMA. *See id.* at 594-95. When Amy Pofahl moved to California, she made arrangements for Morrow to deal with her husband in her absence. *See id.* at 595-96. After Charles Pofahl was arrested, Amy Pofahl contacted Morrow and requested that he visit a locked storage vault in order to retrieve a sum of money which she expected to be stored there. *See id.* at 608. Morrow did not find the money, but retrieved a quantity of MDMA from the vault. *See id.* at 611-12. Amy Pofahl later instructed him to return to the vault to determine whether any MDMA remained. *See id.* at 613.

Pofahl exercised authority over others in furtherance of the conspiracy on other occasions as well. In May of 1989 Amy Pofahl

rented a Lincoln Town Car in Dallas and instructed Dean Bornstein to drive the car to Los Angeles, carrying, among other things, a gym bag full of money. *See id.* vol. 10, at 788-89. Robert Petty smuggled MDMA into the United States for Charles Pofahl. *See id.* at 866-69. However, upon entering the United States with a shipment of MDMA from Guatemala, Petty learned that Charles Pofahl had been arrested. *See id.* at 870. Because he could not deliver the MDMA to Charles Pofahl, Petty sold it for a substantial sum. *See id.* at 871. Thereafter Amy Pofahl contacted Petty and arranged a meeting with him, at which she told Petty that she knew he had either a quantity of MDMA or the proceeds therefrom. *See id.* at 873-74. Amy Pofahl demanded that Petty relinquish the money, which he did at a later meeting. *See id.* at 874-75. When Petty reported that he had sold the MDMA tablets for two dollars apiece, Pofahl commented that she could have sold them for four or six dollars each. *See id.* at 875-76.

Because Amy Pofahl's role in the conspiracy involved negotiating the price of MDMA, recruiting other members of the conspiracy, and directing the actions of others in furtherance of the conspiracy, the district court's characterization of Pofahl as a manager of the conspiracy does not leave us with the definite and firm conviction that a mistake has been committed. *See United States v. Peters*, 978 F.2d 166, 170 (5th Cir. 1992) (upholding enhancement under U.S.S.G. § 3B1.1(c) where defendant recruited others to take part in the offense); *United States v. Liu*, 960 F.2d 449, 456 (5th Cir.) (holding that, in determining whether defendant

is a manager or supervisor, district court should consider recruitment of participants in the offense, the exercise of control over others, and the exercise of decision-making authority), *cert. denied*, ___ U.S. ___, 113 S. Ct. 418, 121 L. Ed. 2d 341 (1992); *Alvarado*, 898 F.2d at 993-94 (upholding enhancement under § 3B1.1(c) where defendant negotiated drug deals, directed the actions of others, and dealt with the proceeds of the criminal enterprise); U.S.S.G. § 3B1.1, comment. (n.1) (recommending that district court consider "the exercise of decision making authority, . . . the recruitment of accomplices, . . . and the degree of control and authority exercised over others" in applying § 3B1.1).

The district court's finding was not clearly erroneous.

## E

Pofahl next contends that the district court erred by enhancing her sentence as a result of an erroneous finding that she attempted to obstruct justice. Section 3C1.1 of the federal sentencing guidelines provides for a two level increase in a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense." *See* United States Sentencing Commission, *Guidelines Manual*, § 3C1.1 (Nov. 1991). The district court imposed an increase of two levels because, at the time of her arrest Pofahl was living part-time in Florida under an assumed name, and because she wrote a letter to her husband, asking him not to provide the authorities with information which would incriminate her. Where a

-47-

district court enhances a defendant's offense level on account of an obstruction of justice, the district court's finding of obstructive conduct is reviewed for clear error. *See United States v. Pierce*, 893 F.2d 669, 677 (5th Cir. 1990); *United States v. Rivera*, 879 F.2d 1247, 1254 (5th Cir.), *cert. denied,* 493 U.S. 998, 110 S. Ct. 554, 107 L. Ed. 2d 550 (1989); *United States v. Franco-Torres*, 869 F.2d 797, 800 (5th Cir. 1989).

The district court's finding of obstructive conduct was not clearly erroneous. Pofahl wrote to her husband during his incarceration in Germany, and implored him to stop providing the authorities with incriminating information about her.[28] Application Note 3 to § 3C1.1 provides as an example of conduct which warrants

---

[28] Pofahl's letter contained the following passages:

Everyone does not want me to correspond with you[, and] considering what info [sic] was passed on to me by your attorney I must agree. Why do you say things that harm me [and] make their case against me stronger[?] I can't try to help [and] support you when you do the opposite. I will always love you Sandy [for]ever but you are forcing me into a position of alienating you because you bring me harm.

\* \* \*

I must say every attorney I've talked to can't believe you're co-operating [and] now they simply are getting statements from everyone you squeled [sic] on . . . Win win situation for them. Everyone goes to prison and no lengthy trial. Except me, little ole Amy))Do me a favor please from now on don't mention my name to anyone anymore. By simply writing this letter I could also be accused of obstruction of justice [and] since I can't trust you to keep your mouth shut I am doing this with great reserve. I'm positive it will come back to haunt me.

Government's Exhibit No. 1058, United States of America vs. Amy Ralston Pofahl, No. W-91-CR-038.

an enhancement for obstruction of justice "conduct prohibited by 18 U.S.C. §§ 1501-1516," *see* U.S.S.G. § 3C1.1, comment. (n.3(i)); and it appears that Pofahl's letter, by which she attempted to prevent her husband from cooperating with the authorities, was prohibited by 18 U.S.C. § 1512(b) (1988). *See* 18 U.S.C. § 1512(b) (prohibiting "corruptly persuad[ing] another person, or attempt[ing] to do so . . . with intent to influence, delay, or prevent the testimony of any person in an official proceeding"); *United States v. Masterpol*, 940 F.2d 760, 763 (2d Cir. 1991) (suggesting that urging a witness to lie to authorities is indictable under § 1512 as corrupt persuasion); *United States v. Kulczyk*, 931 F.2d 542, 546 n.7 (9th Cir. 1991) (same).

Pofahl's correspondence with her husband was not the only conduct which supported an enhancement for obstruction of justice. At the time of her arrest, Pofahl had established a new identity and a new life in Florida. The arresting officers found in Pofahl's possession a Florida driver's license, a birth certificate, and a Social Security card, all in the name of Amy Rossell.[29] *See* Supp. Record on Appeal, vol. 12, at 16. Pofahl was living part-time in Florida with a friend, *see id.* at 17, and she had acquired new bank accounts, a safety deposit box, and storage

---

[29] Pofahl apparently acquired at least the Florida driver's license after she became aware that she was the target of an ongoing investigation. The driver's license was issued on December 13, 1990. *See* Government Exhibit No. 1029, United States of America vs. Amy Ralston Pofahl, No. W-91-CR-038. At that time over a year had elapsed since the search of Pofahl's residence on Carlton Way in Los Angeles, and several months had passed since the search of her residence on West 4th Street.

units in Florida under the name Amy Rossell. *See id.* at 16. Pofahl also purchased an automobile in Florida. *See id.* at 17. Pofahl did not have a telephone number registered in her name in California, where she was residing part-time, and she appears to have been in the process of obtaining a California driver's license under the name Amy Scalisi. *See id.* at 15-17. The aggregate of all the conduct through which Pofahl established a new identity and a new life in Florida suggests persuasively that Pofahl willfully attempted to evade prosecution for her crimes.

In light of Pofahl's letter to her husband, as well as her adoption of a new identity in Florida,[30] the district court's finding that Pofahl attempted to obstruct justice was not clearly erroneous. Therefore, we affirm the district court's imposition of the § 3C1.1 enhancement.[31]

## IV

---

[30] Pofahl argues strenuously that her possession of false identification documents at the time of her arrest did not warrant an enhancement for obstruction of justice under § 3C1.1. *See* U.S.S.G. § 3C1.1, comment. (n.4(a)) (stating that "providing a false name or identification document at arrest" does not warrant an enhancement for obstruction of justice, except when providing the false name or document seriously impedes the administration of justice). However, mere possession of counterfeit identification was not the sole basis for the enhancement of Pofahl's sentence. Pofahl did not merely possess false identification documents. It appears that she used those documents to assume a new identity and embark on a new life in Florida, and it could be inferred that she did so in order to avoid apprehension or impede the investigation of her offenses. That inference is bolstered by Pofahl's letter to husband.

[31] Lastly Pofahl argues that MDMA was not properly designated as a controlled substance. We have already rejected Pofahl's argument. In *United States v. Piaget*, we held that MDMA was properly listed as a controlled substance. *See United States v. Piaget*, 915 F.2d 138, 141 (5th Cir. 1990).

## Charles T. Nunn

### A

Nunn contends that the district court erred in denying his motion for severance. Nunn filed a pre-trial motion to sever pursuant to Fed. R. Crim. P. 14,[32] claiming unfair prejudice due to "the sheer number of defendants and counts in the indictment, the complexity and interrelatedness of issues, and the maze of evidentiary problems."[33] The district court denied Nunn's motion to sever.

Denial of a Rule 14 motion for a severance is reviewable only for abuse of discretion. *See Zafiro v. United States*, ___ U.S. ___, 113 S. Ct. 933, 939, ___ L. Ed. 2d ___ (1993) (holding that determination of the risk of prejudice from joint trials, and of the necessary remedy to avoid such prejudice, are entrusted to the sound discretion of the district court); *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied,* 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); *United States v. Manzella*, 782 F.2d 533, 540 (5th Cir.), *cert. denied,* 476 U.S. 1123, 106 S. Ct. 1991, 90 L. Ed. 2d 672 (1986). "Reversal is warranted only when the appellant can demonstrate compelling

---

[32] Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed. R. Crim. P. 14.

[33] Supp. Record on Appeal, vol. 2, at 56.

prejudice against which the trial court was unable to afford protection." *Arzola-Amaya*, 867 F.2d at 1516; *United States v. Harrelson*, 754 F.2d 1153, 1174 (5th Cir.), *cert. denied,* 474 U.S. 1034, 106 S. Ct. 599, 88 L. Ed. 2d 578 (1985). The rule, rather than the exception, is that persons indicted together should be tried together, especially in conspiracy cases. *See Arzola-Amaya*, 867 F.2d at 1516; *United States v. McGuire*, 608 F.2d 1028, 1031 (5th Cir. 1979), *cert. denied,* 444 U.S. 1092, 100 S. Ct. 1060, 62 L. Ed. 2d 782 (1980).

Nunn claims he was entitled to a severance because his involvement in the drug trafficking as a "mere mule" was extremely limited.[34] Nunn's absence from particular episodes in the conspiracy does not mandate severance. *See United States v. Rocha*, 916 F.2d 219, 228 (5th Cir. 1990), *cert. denied,* ___ U.S. ___, 111 S. Ct. 2057, 114 L. Ed. 2d 462 (1991). Nunn asserts that the amount of evidence offered against him was far less than the evidence offered against his co-defendants,[35] but we have held that a quantitative disparity in the evidence "is clearly insufficient in itself to justify severance." *Harrelson*, 754 F.2d at 1175. Furthermore, Nunn asserts that the reputations of the co-defendants and evidence of their past crimes created a prejudicial spillover

---

[34] See Brief for Nunn at 9-10 (claiming that "[d]efendant's activities were limited to at most 210,000 tablets [of Ecstacy or MDMA] . . . whereas the entire conspiracy dealt in approximately 5.6 million tablets").

[35] *See* Brief for Nunn at 9 (noting that testimony regarding Nunn consisted of 53 pages, while testimony regarding other co-defendants consisted of almost 900 pages).

effect. We have also held that the mere presence of a spillover effect does not ordinarily warrant severance. *See Rocha*, 916 F.2d at 228; *Harrelson*, 754 F.2d at 1178. Moreover, in the case at bar the district court properly instructed the jury to limit evidence to the appropriate defendant.[36] "[J]uries are presumed to follow their instructions." *Zafiro*, ___ U.S. at ___, 113 S. Ct. at 939. Consequently, the jury was able to separate the evidence and properly apply it only to those against whom it was offered. Because Nunn did not suffer compelling prejudice against which the district court was unable to afford protection, we find that the district court did not abuse its discretion by refusing to sever his case.

### B

Nunn also asserts that the district court miscalculated his base offense level by holding him responsible for a large quantity of drugs, the importation of which was not reasonably foreseeable to him. *See* United States Sentencing Commission, *Guidelines Manual*, § 1B1.3(a)(1), comment. (n.1) (Nov. 1991) ("In the case of criminal activity undertaken in concert with others," the defendant

---

[36] The district court's instructions to the jury provided:

In determining whether a Defendant was a member of an alleged conspiracy . . . the jury should consider only that evidence, if any, pertaining to his or her own acts and statements . . . Each count, and the evidence pertaining to it, should be considered separately and individually. The fact that you may find one or more of the Defendants guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other Defendant. You must give separate consideration to the evidence as to each Defendant.

Supp. Record on Appeal, vol. 2, at 166, 174.

is responsible for "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant."). The district court based Nunn's sentence on "all of the trafficking which occurred after he became involved in the conspiracy . . . because . . . he would have known about that and certainly [would] be accountable for it." *See* Supp. Record on Appeal, vol. 13, at 5. The district court held that the appropriate amount of drugs was 1.2 million tablets of MDMA. *See id.* at 8. In addition to 200,000 tablets that Nunn imported or attempted to import, there were 500,000 MDMA tablets in Guatemala undelivered and awaiting importation, and co-conspirator Jerry Williamson imported another 500,000 MDMA tablets from Guatemala. *See id.* at 7. "A district court's findings about the quantity of drugs implicated by the crime are factual findings reviewed under the `clearly erroneous' standard." *Rivera*, 898 F.2d at 445.

Nunn claims that he should only be held responsible for the 200,000 MDMA tablets which he imported or attempted to import, not the 1.2 million tablets the district court attributed to him. Nunn asserts that the 500,000 tablets imported by Williamson are not attributable to him, because their importation predated his participation in the conspiracy. *See* Brief for Nunn at 15, 17-18. Nunn's argument lacks support in the record. Testimony at trial placed the Williamson importation somewhere between late June and August of 1988, *see* Supp. Record on Appeal, vol. 7, at 150-51, 153-

55, and Nunn was involved with the conspiracy several months prior to June of 1988. *See id.* vol. 9, at 676-78.

Nunn also asserts that the 500,000 tablets awaiting importation from Guatemala are not attributable to him because he withdrew from the conspiracy. Witness testimony at trial placed the 500,000 MDMA tablets in Guatemala in February of 1989, the same month Nunn scheduled a trip to Guatemala to import MDMA tablets. *See id.* vol. 10, at 774. After learning that a co-conspirator was arrested, Nunn cancelled his trip to Guatemala, but this did not end his involvement in the conspiracy. *See id.* vol. 9, at 689. We have held that involvement in a conspiracy is presumed to continue and will not be terminated until the co-conspirator acts "affirmatively to defeat or disavow the purpose of the conspiracy." *United States v. Devine*, 934 F.2d 1325, 1335 (5th Cir. 1991), *cert. denied,* ___ U.S. ___, 112 S. Ct. 954, 117 L. Ed. 2d 121 (1992). Nunn's decision to cancel his trip to Guatemala in the face of possible arrest is hardly an affirmative action to defeat the conspiracy. Because Nunn was a member of the conspiracy when the disputed 1 million tablets were imported or when importation was attempted, the district court's finding of reasonable foreseeability was not clearly erroneous. Therefore, we hold that the district court properly calculated Nunn's base offense level.

## C

Nunn contends that he was entitled to a downward adjustment, under § 3B1.2 of the sentencing guidelines, for minimal or minor

participation in the offense.[37] Nunn claims that he was a "mere mule" possessing less knowledge and understanding of the conspiracy than the average participant, and therefore he was a minimal or minor participant in the offense. Section 3B1.2 is designed to reduce a sentence when the defendant is substantially less culpable than the average participant in the offense. *See United States v. Buenrostro*, 868 F.2d 135, 138 (5th Cir. 1989), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1957, 109 L. Ed. 2d 319 (1990). The district court denied Nunn's request for the downward adjustment, stating that it "[did not] believe Mr. Nunn was either a minor or a minimal participant." *See* Supp. Record on Appeal, vol. 13, at 14. A judicial fact-finding that a defendant is not a minimal or minor participant will enjoy the protection of the clearly erroneous standard. *United States v. Mejia-Orosco*, 867 F.2d 216, 221 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L. Ed. 2d 602 (1989).

We have held that a "`mule' or transporter of drugs may not be entitled to minor or minimal status." *United States v. Bethley*,

---

[37]    Section 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.
United States Sentencing Commission, *Guidelines Manual*, § 3B1.2 (Nov. 1990).

973 F.2d 396, 401 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1323, ___ L. Ed. 2d ___ (1993); *Buenrostro*, 868 F.2d at 137-38. Nunn's role as a courier was not limited to a single delivery, but included a second delivery attempt which was later aborted. Additionally, Nunn's role was not confined to that of a mule. Nunn recruited an individual named "David" to transport an MDMA shipment from Guatemala into the United States, and received large payments for his efforts. *See* Supp. Record on Appeal, vol. 9, at 678, 684-87. Consequently, the district court's finding that Nunn's role was not minimal or minor was not clearly erroneous, and Nunn was not entitled to an adjustment under § 3B1.2.

### D

Nunn also contends that he was entitled to a downward adjustment, under § 3E1.1 of the sentencing guidelines, because he accepted responsibility for the offense.[38] Nunn claims that he cooperated with the authorities and provided "extensive debriefing of his criminal conduct." Brief for Nunn at 23-24. However, the

---

[38] Section 3E1.1 provides:

(a) If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense by 2 levels.

(b) A defendant may be given consideration under this section without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of conviction at trial.

(c) A defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right.

United States Sentencing Commission, *Guidelines Manual*, § 3E1.1 (Nov. 1991).

district court found that Nunn did not accept responsibility for the offense. *See* Supp. Record on Appeal, vol. 13, at 10. This finding by the district court "is entitled to great deference, greater than that accorded under the clearly erroneous standard." *United States v. Gonzalez-Basulto*, 898 F.2d 1011, 1013 (5th Cir. 1990) (quoting *United States v. Tellez*, 882 F.2d 141, 143 (5th Cir. 1989)).

Section 3E1.1 "requires a showing of sincere contrition on the defendant's behalf to warrant the reduction." *United States v. Beard*, 913 F.2d 193, 199 (5th Cir. 1990); *United States v. Reed*, 882 F.2d 147, 150 (5th Cir. 1989). The guidelines also provide that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, comment. (n.2). Moreover, only "[i]n rare situations [may] a defendant . . . clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.*

Nunn claims that his pre-trial discussions with officers, where he admitted involvement in the drug trafficking, qualify as acceptance of responsibility. However, Nunn plead not guilty and proceeded to trial, where his counsel argued emphatically for acquittal. *See* Supp. Record on Appeal, vol. 11, at 1112, 1119-20. Furthermore, Nunn's admission of guilt))"I guess I'm guilty of both [counts]"))came only after the jury returned a verdict of guilty.

*See* Presentence Report, United States of America v. Charles Thomas Nunn, No. W-91-CR-038, at 24 (sealed).  In light of those facts, the district court's finding))that Nunn did not accept responsibility))was not erroneous.

**E**

Nunn asserts that the district court erred by increasing his offense level under § 2D1.1(b) of the Federal Sentencing Guidelines[39] due to possession of a firearm, without first specifically finding that Nunn possessed the weapon, as required by Fed. R. Crim. P. 32.  During Nunn's arrest at his home/business on July 2, 1991, police officers confiscated a handgun stored in a drawer with assorted drugs.  The Presentence Report (PSR) alleged that the pistol belonged to Nunn, and that he possessed it at the time of and in connection with his offenses.  *See* Presentence Report, United States of America v. Charles Thomas Nunn, No. W-91-CR-038, at 26-27 (sealed).  Therefore the PSR recommended an enhancement of 2 levels under § 2D1.1(b)(1).  *See id.*  Nunn contended in his objections to the PSR and at the sentencing hearing that the enhancement for possession of the gun was improper because the weapon belonged to his roommate.  *See* Letter from

---

[39]  Section 2D1.1(a) provides the base offense level for, *inter alia*, the unlawful trafficking of drugs.  Section 2D1.1(b)(1) further provides:

(b) Specific Offense Characteristics

(1) If a dangerous weapon (including a firearm) was possessed, increase by 2 levels.

United States Sentencing Commission, *Guidelines Manual*, § 2D1.1 (Nov. 1991).

-60-

Attorney J. Marlin Blackledge to U.S. Probation Officer Mikal Klumpp at 4, attached to Presentence Report; Supp. Record on Appeal, vol. 13, at 11. After hearing argument from both sides at the sentencing hearing, the district court overruled Nunn's objection without explanation. *See* Supp. Record on Appeal, vol. 13, at 12.

Nunn argues that the district court was required by Fed. R. Crim. P. 32(c)(3)(D) to make specific factual findings as to whether Nunn possessed the gun. Rule 32(c)(3)(D) provides:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

Fed. R. Crim. P. 32(c)(3)(D). The issue of Nunn's possession of the gun was in dispute, by virtue of Nunn's objections to the PSR and his counsel's argument at sentencing. Consequently, the district court was required either to resolve the dispute or to determine that possession of the gun would not be taken into account in sentencing. Because the district court failed to do either, we must vacate Nunn's sentence and remand to the district court for specific findings as to whether Nunn possessed the pistol, or a determination that possession of the gun will not affect Nunn's sentence. *See United States v. Sherbak*, 950 F.2d 1095, 1098-99 (5th Cir. 1992) (vacating and remanding for specific findings as to amount of drugs attributable to defendant) (citing

*United States v. Warters*, 885 F.2d 1266, 1271-73 (5th Cir. 1989); *United States v. Burch*, 873 F.2d 765, 767-68 (5th Cir. 1989)); *United States v. Hooten*, 942 F.2d 878, 881-82 (5th Cir. 1991) (remanding for findings as to possession of gun).

On remand, if the district court determines that Nunn did not possess the gun personally, the enhancement under § 2D1.1 is still appropriate if the gun was possessed by one of Nunn's accomplices, and the accomplice's possession was reasonably foreseeable to Nunn. *See* U.S.S.G. § 1B1.3(a)(1), comment. (n.1) (Nov. 1991); *Hooten,* 942 F.2d at 881-82. "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n.3). The firearm need not be an integral part of the offense; simple use or possession per se is justification for the upward adjustment. *See United States v. Hewin*, 877 F.2d 3, 5 (5th Cir. 1989); *see also United States v. Otero*, 868 F.2d 1412, 1414 (5th Cir. 1989).

## V

### *Randy White*

### A

Randy White contends that the district court erred by allowing IRS Special Agent Gary Terrell to testify regarding statements made by White during an interview in White's home. White argues that his rights under the Fifth Amendment were violated, because the self-incriminating statements admitted into evidence were made by White without the benefit of the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Special Agents Terrell and Gallman went to White's apartment to serve a subpoena in connection with the investigation of the Pofahl-Key MDMA conspiracy. When the agents arrived, White stated that he knew they were there to talk about MDMA, and he invited them inside. White voluntarily spoke to the agents for about an hour and a half, during which he explained his dealings in MDMA in detail. White was not given *Miranda* warnings. Before trial, White moved to suppress evidence of any statements that he made to Terrell and Gallman, on the grounds that he was not given the warnings required by *Miranda*. The district court found that *Miranda* warnings were not required, because White voluntarily invited the agents into his apartment and proceeded to speak to them, and because White was never in custody during the conversation with the agents. *See* Supp. Record on Appeal, vol. 4, at 144. Therefore, the district court denied White's motion to suppress.

The district court properly denied White's motion, because White was not entitled to *Miranda* warnings. *Miranda* requires that the warnings be given prior to a custodial interrogation. *See Miranda*, 384 U.S. at 467, 478-79, 86 S. Ct. at 1624, 1630; *see also Illinois v. Perkins*, 462 U.S. 292, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990); *United States v. Harrell*, 894 F.2d 120, 123 (5th Cir.), *cert. denied,* 498 U.S. 834, 111 S. Ct. 101, 112 L. Ed. 2d 72 (1990). The district court correctly held that White was not in custody when he confessed to Gallman and Terrell. A person is "`in custody' for *Miranda* purposes when placed under formal arrest or

when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.) (en banc), *cert. denied,* 488 U.S. 924, 109 S. Ct. 306, 102 L. Ed. 2d 325 (1988); *see also United States v. Harrell*, 894 F.2d 120, 123 (5th Cir. 1990) (citing *Bengivenga*). The record does not indicate that White was under arrest or that he was subject to a restraint of his freedom comparable to formal arrest. The record demonstrates that White spoke to the agents in his home, of his own volition. We agree with the district court's conclusion that White was never in custody, and therefore was not entitled to suppression of the statements which he made without the benefit of *Miranda* warnings. *See Harrell*, 894 F.2d at 125 ("A reasonable person, questioned within his own home, would not suffer `a restraint on freedom of movement of the degree which the law associates with formal arrest.'").

## B

White also argues that the district court improperly calculated his base offense level by holding him responsible for an excessive quantity of MDMA.[40] Under § 1B1.3 of the federal sentencing guidelines, the district court was required to assign

---

[40] *See* Brief for White at 20 ("[T]he Government, over the objections of counsel, greatly exaggerated the amount of contraband sold by Appellant, thereby enhancing the severity of the sentence Appellant received."); Reply Brief for White at 5 ("Obviously, the trial court considered the maximum number of pills in applying the guidelines . . . .").

White a base offense level corresponding to the amount of drugs which was reasonably foreseeable to him. *See* U.S.S.G. § 1B1.3(a)(1), comment. (n.1) (Nov. 1991).

The district court held White accountable for 200,000 MDMA tablets. *See* Supp. Record on Appeal, vol. 14, at 37. The district court's finding that this amount of drugs was reasonably foreseeable to White is reviewed only for clear error. *See Rivera*, 898 F.2d at 445 ("A district court's findings about the quantity of drugs implicated by the crime are factual findings reviewed under the `clearly erroneous' standard."). We will not regard the district court's finding as clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed. *Mitchell*, 964 F.2d at 457-58.

The district court's finding of reasonable foreseeability of 200,000 tablets was not clearly erroneous. Evidence at trial revealed that White dealt in large quantities of MDMA, and knew of dealings in MDMA by other members of the conspiracy. White entered into an agreement with Tom and Dan Drath in the fall of 1987, under which he purchased from the Draths two to three thousand MDMA tablets per week. *See* Supp. Record on Appeal, vol. 8, at 459; *id.* vol. 14, at 12. White continued to buy drugs from the Draths and resell them, until December of 1988. *See id.* vol. 14, at 12. Tom Drath estimated that he sold White "100,000 to perhaps 150,000" tablets of MDMA during the course of their business relationship. *See id.* vol. 8, at 417. White sold Shawn Guillory "a few thousand to 12,000" tablets per month. *See id.* vol. 14, at 25. White sold

an individual named Sammy five hundred to a thousand tablets from time to time.  *See id.*

On the basis of those facts, the district court certainly could have concluded that White personally dealt in more than a hundred thousand MDMA tablets during the course of his involvement in the conspiracy.  Moreover, White knew that he was not the only person distributing MDMA on behalf of the Draths.  *See id.* vol. 8, at 446.  White knew that he had a "major competitor" named Craig who also acquired MDMA from the Draths.  *See id.* at 447.  Given that information, White should have realized that the conspiracy involved dealings in substantial quantities of MDMA in addition to the tens of thousands of tablets which he bought and sold.  White could reasonably have foreseen that the conspiracy would lead to trafficking in at least 200,000 tablets of MDMA.  Therefore, the district court did not commit clear error by finding that trafficking in that quantity of MDMA was reasonably foreseeable. The district court properly sentenced White on the basis of 200,000 half-gram tablets of MDMA.

## VI

For the reasons stated in Part IV.E. *supra*, Charles Nunn's sentence is VACATED, and his case is remanded to the district court.  Nunn's conviction is AFFIRMED, as are the convictions and sentences of Pofahl and White.