IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

S))))))))))))))))Q
No. 93-2126
S))))))))))))))))Q


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus


MATTIAS MUNOZ, JR.,

Defendant-Appellant.


S)))))))))))))))))))))))))))Q
Appeal from the United States District Court for the
Southern District of Texas
S)))))))))))))))))))))))))))Q
(February 17, 1994)

Before JOHNSON, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Mattias Munoz, Jr. (Munoz) appeals his conviction, following a jury trial, of violating 18 U.S.C. § 922(g), by possessing "a firearm, namely, a New England Firearms Company, model Pardner SB-1, 20 gauge shotgun," when he had been convicted of a felony.

Munoz asserts that the evidence is insufficient because there was no showing the weapon in question was a "firearm" in that there was no evidence it met the 18 U.S.C. § 921(a)(3)(A) definition as a weapon that "will or is designed to or may readily be converted

to expel a projectile by the action of an explosive." We reject this contention. The government's witness testified that he purchased and received a "shotgun" from Munoz and that Munoz then informed him that it worked; the shotgun itself was identified by the witness and introduced in evidence; and the prosecution and defense stipulated before the jury that "the firearm alleged in the indictment was in and affecting interstate commerce"; there was no evidence that the shotgun was not designed to (or would not or could not readily be converted to) expel a projectile by the action of an explosive. We hold that the evidence was sufficient. *See United States v. Polk*, 808 F.2d 33, 34 (8th Cir. 1986); *United States v. Rouco,* 765 F.2d 983, 996 (11th Cir. 1985), *cert. denied*, 475 U.S. 1124 (1986).

Munoz's remaining two complaints relate to jury selection.

Munoz first asserts that the district court erred in overruling his challenge for cause to venire member Rowley, whom Munoz contended was biased in favor of law enforcement. Neither Rowley nor his wife were shown to be, or to have ever been, engaged in law enforcement, or to have had any knowledge of any of the events at issue or any of the participants therein. Nor was Rowley shown to have had any experience with any criminal offense, other than the fact that he had a brother-in-law who had been convicted of an unidentified felony, whom Rowley said "got what he deserved." Rowley was a member of the National Rifle Association and said that would not affect his decision in the case. His two sons, his only children, were police officers in Huntsville, Texas; a brother was

2

a retired police chief in Mississippi; and a brother-in-law was or had been a chief of police in Bee County, Texas, for whom "the last new penitentiary" was named. The events in issue and the trial occurred in Houston, Texas, and none of the law enforcement agencies with which Rowley's relatives were or had been affiliated were involved; nor was there any indication of any specific experience of any of these (or any other) relatives of Rowley. In response to questions by the court, Rowley indicated that his family history, and any of his family's job experiences that might have related to him, would not prevent him from being fair to all sides and he could keep an open mind and follow the court's instructions.

Rowley did express several pro-law enforcement opinions. In response to questioning by the court he said "sometimes I don't think they [criminal defendants] get enough." However, he assured the court that he could put aside any general feelings he had and follow the court's instructions on the burden of proof and presumption of innocence and decide the case on the evidence and the court's instructions. On questioning by defense counsel, Rowley said that if all he knew about it was that the defendant had been indicted, he would think he was guilty. Defense counsel then asked whether, if the court instructed that a guilty verdict could not be based on the indictment (no instructions in that respect had then been given), Rowley could follow that instruction, knowing that the defendant had been indicted and was a convicted felon. Rowley answered that he could. He further stated that he could put

3

aside any contrary feeling. On further inquiry by defense counsel, Rowley stated that he believed law enforcement officers by virtue of their training would be "better able to recognize someone." On questioning by the court, Rowley said that with respect to identification he would be able to make his decision on the basis of the evidence and the court's instructions.

In challenging Rowley, defense counsel noted that "[t]he Court appeared to rehabilitate him. He appeared to be saying I can follow the court's instructions. I think he has a rather pro government bias he can't put aside in this case." The court denied the challenge, noting that Rowley expressed belief in his ability to be fair and keep an open mind. After peremptory challenges were exercised, defense counsel renewed her motion, noting she had stricken Rowley but had used all her peremptory challenges, identifying two jurors she would have stricken if she had not. The court denied the renewed motion, finding that based on her colloquies with Rowley and observation of his demeanor, she was satisfied Rowley had answered truthfully as to his ability to be fair and that he could be fair.

We review the district court's ruling as to juror impartiality only for manifest abuse of discretion. *United States v. Bryant*, 991 F.2d 171, 174 (5th Cir. 1993). Munoz relies on *United States v. Apodaca*, 666 F.2d 89 (5th Cir.), *cert. denied*, 103 S.Ct. 53 (1982), where "the case had been initiated and prepared by the FBI," the challenged juror, who had heard of the case in the newspapers, had worked for the FBI and her husband had done so for

4

thirty years, she knew "how much investigation went into a case before presentment to a grand jury," and thus "might . . . give a little more credence to the prosection." *Id*. at 93. We held the district court did not abuse its discretion in denying the challenge for cause, but stressed that "the proposed FBI witnesses *did not appear*" and noted that "some place along the line we must know, no matter what a witness says, that he or she has an institutional bias he cannot overcome." *Id*. at 94. In the present case, however, neither Rowley nor his wife had been in law enforcement and Rowley's relatives then or previously so employed were never affiliated with any of the law enforcement agencies involved in this case, nor did it arise within their area of operation. We recognize that extra precautions may be appropriate to guard against assumptions by jurors that favor law enforcement witnesses over others where the case is one "pitting police testimony against that of a defense witness." *See United States v. Amerson*, 938 F.2d 116, 117 (8th Cir. 1991); *United States v. Evans*, 917 F.2d 800, 807 (4th Cir. 1990) ("this case was going to be decided on the basis of whether the jury believed Valentine, testifying for the government, or the defendants, testifying for themselves"). Here, however, although a law enforcement officer testified, his testimony was not meaningfully challenged, there was no defense evidence whatever, and the government's case was strong and wholly unrebutted.

We are unable to conclude that the district court abused its discretion in overruling the challenge for cause to venireman

5

Rowley, and hence reject Munoz's complaint in this respect.[1]

Munoz's final contention is that two of the government's peremptory strikes, one as to an Hispanic and the other as to an African-American, violated *Batson v. Kentucky*, 106 S.Ct. 1712 (1986).

After strikes, defense counsel raised the matter with the court as follows:

> ". . . [I]t appears that the government has struck the only Hispanic member of the jury, Salazar. They also struck one black member, Cleo Thomas. For the record, although I don't think it matters anymore, the defendant is Hispanic. We would suggest that makes out a prima facie case of racial discrimination and ask that the government be required to explain its peremptories.
>
> THE COURT: Mr. Davis [the prosecutor].
>
> MR. DAVIS: Judge, with regard to juror number 2

---

[1] As we agree with the government on this issue, we do not reach its alternative contention, based on *United States v. Prati*, 861 F.2d 82, 87 (5th Cir. 1982), that any error was harmless because Rowley did not serve. *Prati* may be distinguishable as it involved sustaining a challenge for cause (and does not expressly reflect that the government used all its peremptory challenges). There may be something to be said for not penalizing the *grant* of challenges for cause in close or doubtful cases. *Cf. Queen v. Hepburn*, 7 Cranch (11 U.S.) 290, 297-98, 3 L.Ed. 348, 350 (1813) (trial court may properly excuse juror for possible predisposition to one side even though that was not to such an extent as to require sustaining of challenge for cause). If *Prati* is not so construed, it may be inconsistent with earlier decisions of this Court such as *United States v. Nell*, 526 F.2d 1223, 1229-1230 (5th Cir. 1976). *See also Bryant*, 991 F.2d at 174 n.3. Moreover, *Prati* relies on *Ross v. Oklahoma*, 108 S.Ct. 2273 (1988), which applied constitutional standards in reviewing a state criminal conviction and death sentence. It is not clear that we are restricted to such standards in reviewing a federal criminal conviction on direct appeal, where reversal may be proper even though the error complained of is not of constitutional magnitude. While peremptory challenges, or the number provided by Fed. R. Crim. P. 24(b), may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal.

[Roger Salazar], he indicated that he spoke Spanish. And [we] also struck juror number 18 [Paula Price], who spoke Spanish as well because I anticipate there are going to be Spanish in the tapes. I didn't want any arguments in the jury as to their possible translation of the tapes versus what is provided in the transcript to English speakers.

          . . . .

          Judge, with regard to juror number 22 [Cleo Thomas] had indicated that she has got children who were on welfare. That apparently this person does not work. I didn't feel that that was the type of person that I wanted on the jury. And also just for the record, there is a black female who is seated on the jury.

          THE COURT: Anything further?

          MS. MEYERS [defense counsel]: We would just argue that the reasons for striking the Hispanic member are insufficient. There is no dispute about the accuracy of the tape in this case.

          THE COURT: Anything further that you have, Mr. Davis?

          MR. DAVIS: No, Judge.

          THE COURT: . . . [A]s to juror member number 2 who was the only Hispanic on the panel, I find that the government's statement of reasons for having exercised a peremptory challenge with regard to that member of the panel not to be based on any impermissible factor. The other member of the panel who indicated a familiarity with Spanish was also struck.

          There is a black female who is a member of the seated jury. And the Court is satisfied that there is no impermissible ground that was used as a basis for the exercise of any challenges on the part of the government. Anything further at this point?

          MS. MEYERS: No, Your Honor."

Striking a juror on the basis of race, including Hispanic ethnicity, clearly violates *Baton*. *See Hernandez v. New York*, 111 S.Ct. 1859 (1991). If the prosecutor articulates a race-neutral explanation for a challenged strike, the district court's decision

7

to credit the explanation is reviewed under the clearly erroneous rule. *Id*. at 1869; *United States v. Pofahl*, 990 F.2d 1456, 1466 (5th Cir. 1993).

Turning first to the Hispanic venireman, we note that the stated reason was not ethnicity, but rather that the prosecutor did not want Spanish-speaking jurors because the prosecutor "didn't want any arguments in the jury as to their possible translation of the tapes versus what is provided in the transcript to English speakers." There was indeed a tape introduced of Munoz's conversation with the government's witness when Munoz sold and delivered the gun to him, and part of what Munoz said on the tape was in Spanish. While defense counsel then said "[t]here is no dispute about the accuracy of the tape," there is nothing in the record to reflect that this previously had been communicated to, much less stipulated with, the prosecutor; further, the relevant subject was the accuracy of translation, not of the tape. At all events, the concern expressed by the prosecutor was arguments or differences among the jurors as to the proper translation, not simply an overt challenge by the defense. That defense counsel thought the matter had possible relevance is reflected by the fact that she brought it up earlier on *voir dire*:

> "MS. MEYERS: You may hear a tape recording that has some Spanish on it. Is there any member of the panel who speaks or understands Spanish?
>
> MR. SALAZAR: Number 2, Roger Salazar. I do.
>
> MS. MEYERS: And number?
>
> MS. PRICE: 18, Paula Price.

8

MS. MEYERS: Anyone else? I thought I saw one more hand.

Anything I have said here today that makes you think you couldn't be a fair and impartial juror in this case?"

Finally, that language, rather than ethnicity, was the basis of the prosecutor's strike in this respect is reflected by the fact that he also struck Paula Price, who spoke Spanish but was not Hispanic, and who was cross-struck by the defense (her brother had been with the FBI and his wife was a police officer in Corpus Christi).

Munoz argues that *any* striking based on Spanish-speaking ability, at least in Texas, is the equivalent of a strike based on ethnicity. It may be that in certain, or even most, situations in Texas striking on such a basis would be the equivalent of or a pretext for prohibited striking for ethnicity. But *not* in all cases, as *Hernandez* indicates. The plurality there stated that "a policy of striking all who speak a given language, *without regard to the particular circumstances of the trial* or the individual responses of the jurors, *may* be found to be a pretext for racial discrimination." *Id.*, 111 S.Ct. at 1873 (emphasis added). Here we are unable to conclude that the trial court was clearly erroneous in determining that the prosecutor's explanation for striking Salazar was race neutral, was tied to the particular circumstances of the trial, and was not pretextual. We hence overrule Munoz's contention as to Salazar.

Finally, we turn to the complained of strike of the female African-American venire member Cleo Thomas. The prosecution's

9

stated reason for the strike was that she had children on welfare and apparently was unemployed. The prosecution noted that another female African-American served on the jury.[2] This explanation was accepted by the district court as race-neutral. The explanation is not facially racial. *See Pofahl*, 990 F.2d at 1466 (employment and economic status are nonracial). *See also United States v. Moreno*, 878 F.2d 817, 820 (5th Cir.), *cert. denied*, 110 S.Ct. 508 (1989) ("young, single, unemployed and inexperienced"). Moreover, when the district court ruled, defense counsel had questioned the explanation for the strike of Salazar but had not questioned in any way the explanation for the Cleo Thomas strike; nor did defense counsel ever do so in the trial court. While defense counsel belatedly attempts to do so on appeal, which we do not approve, the government in any event responds by correctly pointing out that no other prospective juror indicated that they were unemployed and had family members on welfare. *Cf. Moore v. Keller Industries, Inc.*, 948 F.2d 122, 202 (5th Cir. 1991). We reject the complaint as to the striking of Cleo Thomas.

Having rejected all of Munoz's complaints on appeal, his conviction and sentence are accordingly

AFFIRMED.

---

[2]    There is no indication whether any male African-Americans served on the jury. For the sake of argument only, we assume none did; by the same token, however, we cannot assume that any were among the relevant venire and/or were struck by the prosecution. Nor can we assume that the prosecution struck any African-American other than Cleo Thomas.

10