**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 98-10285**

---

**UNITED STATES OF AMERICA,**

**Plaintiff - Appellee,**

**VERSUS**

**LEVI WOODERTS, JR; DORSEY L TURNER;**
**ROBERT GAINES; EMMITT LYDIA, III,**

**Defendants - Appellants.**

---

**Appeal from the United States District Court**
**for the Northern District of Texas**

**(3:97-CR-54-1-D)**

---

**July 6, 1999**

Before WIENER, DeMOSS, and PARKER, Circuit Judges.

PER CURIAM:[*]

Levi Wooderts,Jr., Dorsey L. Turner, Robert Gaines, and Emmitt Lydia, III, appeal their convictions and sentences arising from a conspiracy to operate a chop shop in Dallas, Texas.  We affirm.

**I.**

This case involves a multiple-defendant conspiracy to operate a chop shop.  The FBI discovered this chop shop by sending Special Agent Donald Ramsey undercover to pose as a used car parts buyer.

---

[*] Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

On April 8, 1996, Ramsey was introduced to Appellant Levi Wooderts. Ramsey bought parts from Wooderts and gave him a business card for future reference. Wooderts called Ramsey on April 11 to discuss selling more parts, and the two met the following day. Wooderts delivered parts to Ramsey's storefront on April 12. The delivery was recorded on videotape. Ramsey bought parts from Wooderts and his associates from April until September 1996. These parts came from forty-one identifiable cars, plus others. Parts from eight vehicles were altered.

Wooderts was identified at trial by Ronald Wadley, a co-defendant who testified that he stole cars, supplied them to a chop shop operated by Wooderts out of a garage on Emery Street, witnessed the stripping of vehicles, and assisted in the delivery of parts to the storefront. Wadley testified that Wooderts was present while Wadley stole a truck which was then delivered to the chop shop. Derrick Walton, Wadley's brother, testified that Wooderts was in charge of the overall operation. FBI surveillance videotapes shot outside the chop shop on October 1, 1996, show Wooderts arriving and gathering with various co-defendants.

Wooderts testified that he knew nothing about how the parts he sold were originally obtained. He admitted being present when Wadley stole a black truck, but denied involvement. He admitted that he knew at some point that his enterprise was illegal, but he kept doing it anyway. He acknowledged nineteen prior convictions for similar offenses over a twenty-year period.

Appellant Dorsey Turner was observed by FBI agents at the storefront on September 3, 1996. He transported two engines in his own vehicle, and assisted in the unloading of the engines and other parts from three cars. Wadley testified that Turner had keys to the chop shop, and that he had witnessed Turner participating in the stripping of the vehicles at the chop shop. Co-defendant William Menefee testified that he saw Turner dismantle new trucks and drain the gas out of trucks that were being dismantled. FBI surveillance videotapes shot outside the chop shop on October 1, 1996, show Turner arriving in his own truck, and later maneuvering the truck in the driveway. Wadley testified that this was done to block views into the garage.

Wooderts testified that Turner had nothing to do with any chop shop, alteration of parts, or sale of altered parts.

Appellant Robert Gaines never visited the storefront. The Emery Street garage where the chop shop was located was rented to Gaines by Robert Burks. Wadley identified Gaines as the man in charge of the actual chop shop (*i.e.*, the vehicle stripping or "cutting" part of the enterprise). This testimony was corroborated by Walton. Wadley testified that he had seen Gaines at the chop shop, that Gaines had keys to the chop shop, and that Gaines would actually break up the vehicles, assisted by Turner. Co-defendant Johnny Jackson, a participant who loaded the parts after they had been stripped from vehicles, identified Gaines as one of the people he most frequently saw at the chop shop. Menefee testified that he witnessed Gaines dismantling trucks. FBI surveillance videotapes

shot outside the chop shop on October 1, 1996, show Gaines arriving in his black Trans Am, and leaving and returning later in the day.

Wooderts testified that Gaines had nothing to do with any chop shop, alteration of parts, or sale of altered parts.

Appellant Emmitt Lydia never visited the storefront. Wadley identified Lydia as a fellow car thief who assisted in the theft of two of the trucks stripped for parts sold to Ramsey. According to Wadley, Lydia acted as a lookout while Wadley stole one of the trucks. This testimony was corroborated by Walton. Wadley testified that he had seen Lydia at the chop shop, and that Lydia had watched the stripping of a truck, but Lydia did not participate because he was on crutches. FBI Agent Danny Sisco, who conducted surveillance in this case, observed Lydia watching one of the stolen vehicles being rolled in and out of the chop shop as parts were unloaded from it into a U-Haul truck. FBI surveillance videotapes of the exterior of the chop shop on October 1, 1996, show Lydia driving Wooderts to the garage in a maroon Cadillac; Lydia is also seen at various times gathering with other defendants by a white car, and leaving and returning later in the day.

Lydia denied involvement with any chop shop, alteration of parts, or sale of altered parts. He admitted being present when a truck was stolen, but he denied participation. Lydia acknowledged five prior convictions for similar conduct.

Wooderts testified that Lydia had nothing to do with any chop shop, alteration of parts, or sale of altered parts.

Wooderts, Turner, Lydia, and others were indicted on February 25, 1997, and charged with operating a chop shop. A superseding indictment filed on June 24, 1997, added Gaines as a defendant and added charges of conspiracy to operate a chop shop. A second superseding indictment filed on July 29, 1997, charged the defendants with altering or tampering with motor vehicle identification numbers and trafficking in altered motor parts and conspiracy to alter or tamper with motor vehicle identification numbers and to traffic in altered motor parts.

The case was tried on December 1, 1997. Count 1 was the conspiracy count; Counts 2-9 were the alteration of motor vehicle parts counts; Counts 10-17 were the trafficking counts. Wooderts and Gaines were found guilty on all counts. Turner was found guilty of conspiracy and one trafficking count; he was acquitted on all other counts. Lydia was found guilty on the conspiracy count, two alteration counts, and two trafficking counts.

The appellants received the following terms of imprisonment: Wooderts, 240 months; Gaines, 85 months; Turner, 37 months; Lydia, 96 months. The prison terms are followed by a three-year term of supervised release. They were ordered to pay $386,589.03 in restitution, but no fines. All four timely appeal.

## II.

Lydia challenges the sufficiency of the evidence against him.

> [We] must consider the evidence in the light most favorable to the Government, drawing all reasonable inferences in support of the jury's verdict. The evidence is sufficient if a rational trier of fact

-5-

could have found the essential elements of the crime beyond a reasonable doubt.  A review of the sufficiency of the evidence, however, does not include a review of the weight of the evidence or of the credibility of the witnesses.[2]

Lydia was convicted on the conspiracy count and four substantive counts.  He argues that although evidence demonstrates that he stole cars and knew the cars were being taken apart and sold for parts, there is no evidence that he knew anything about the alteration of vehicle identification numbers (VINs).  Lydia argues that alteration of VINs is an element of every charged offense, including conspiracy to commit the substantive offenses, and therefore he cannot be convicted without evidence that he altered VINs or was aware that VINs were being altered.

The government responds that Lydia was validly convicted on the conspiracy count, and that he can be held vicariously liable on substantive counts for his co-conspirators' criminal conduct under the doctrine of *Pinkerton v. United States*, 328 U.S. 640 (1946).

With respect to the conspiracy conviction, Lydia hangs his hat on the legal requirement that he be a "knowing" participant in the conspiracy.  Since "mere presence" at a crime scene or association with members of a conspiracy is not legally sufficient evidence of knowing participation in a conspiracy, Lydia argues that his "mere presence" at the chop shop is insufficient evidence to convict him, as he was blissfully ignorant that one element of the charged substantive offenses -- alteration of VINs -- was being contemplated and committed by the others.

---

[2]     *United States v. Powers*, 168 F.3d 741 (5th Cir. 1999).

-6-

Though knowing participation is required, Lydia is wrong that his ignorance of the alteration of VINs immunizes him from conviction for conspiracy to violate §§ 511 and 2322. Lydia's argument is similar to one that has been frequently rejected by this Court. He has essentially argued that there were multiple conspiracies, and the conspiracy he engaged in -- a conspiracy to steal cars, strip them, and sell their parts, but protect their VINs -- was a separate, lesser conspiracy that was not charged in the indictment. We are not persuaded. "[A] conspirator may not willfully and knowingly participate in a criminal scheme and then disclaim responsibility when his coconspirators later take actions that are the necessary or natural consequence of the unlawful agreement. Nor may the same end be achieved by simply alleging that each illegal objective constitutes a separate conspiracy."[3] We reject Lydia's contention that evidence of his knowledge of the destruction of VINs was necessary to support conspiracy, and conclude that there is sufficient evidence of his participation to validate the jury's verdict.

Since Lydia has been validly convicted for conspiracy, there is absolutely no defect in the proof holding him liable for the substantive offenses. *Pinkerton* holds that all conspirators are vicariously liable for reasonably foreseeable crimes committed by co-conspirators in furtherance of the conspiracy. Obliteration of a VIN which might otherwise allow a sold part to be traced back to

---

[3] *United States v. Brasseaux*, 509 F.2d 157, 161 (5th Cir. 1975); *see also United States v. Becker*, 569 F.2d 951, 960 (5th Cir. 1978).

-7-

the chop shop is a foreseeable act in furtherance of a conspiracy to steal cars and sell their parts.

## III.

Turner moved for acquittal or new trial. Denial of a motion for acquittal is reviewed for sufficiency of the evidence. Denial of a motion for new trial is reviewed for abuse of discretion.

Turner argues that his acquittal on all § 511 violations is inconsistent with his conviction on a count of § 2321, because § 2321(b) specifically provides that no crime is committed if there has been no § 511 violation. Turner further argues that conviction on both counts was not supported by evidence because the evidence gave equal support to theories of guilt and innocence. He claims that his acquittal on many counts indicates that the jury disbelieved the testimony of the government's witnesses. Furthermore, he argues there is no evidence indicating that he knew the parts he delivered (when he was captured on videotape) were stolen.

Regarding his request for new trial, Turner characterizes the verdict as a "compromise verdict," and, therefore, a miscarriage of justice mandating a new trial. He also contends that denial of his motion for severance (*see infra* Part VI) was grounds for new trial.

The plain text of the statutes reveals that acquittal for § 511 is not inconsistent with conviction for § 2321. Section 511 prohibits actually altering a VIN. Section 2321 prohibits knowing sale or distribution of a part with an altered VIN, but does not

require actual alteration of a VIN. So, for example, one could conduct operations in a chop shop without actually altering VINs.

There was, in fact, amply sufficient evidence (*i.e.*, concerted action with the others, including assisting in the cutting of vehicles and assisting in the delivery of parts) to support the jury's conclusion. The fact that the jury acquitted Turner on numerous charges does not mean that they wholly discounted the testimony of government witnesses, and the verdicts of acquittal do not erase that evidence from the record. That evidence supports the convictions that were returned. The district court did not abuse its discretion in denying a new trial, since Turner did not demonstrate prejudice resulting from the denial of his motion for severance, and Turner's acquittal on some counts does not compel the conclusion that the jury reached a compromise verdict.

## IV.

Gaines complains that the government used a peremptory challenge to strike a black juror. Pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), Gaines appeals his conviction based on this allegedly race-based strike. The district court determined that the prosecution gave a legitimate, race-neutral explanation for the strike. That determination is reviewed for clear error.

Counsel for Turner stated that he believed the prospective juror in question worked as a secretary at his law firm. That is the reason articulated by the prosecution for its strike. The

district court determined that this was a permissible basis for striking the prospective juror, and overruled Gaines's objection.

There was no clear error here. Employment may be a valid, race-neutral reason for exclusion,[4] and this is especially true when there is a suggestion of such a clear link by employment between the prospective juror and the defense.

## V.

Gaines unsuccessfully moved for a severance. The district court's denial of that motion is reviewed for abuse of discretion.

Severance need be granted only when there is a serious risk of compromising the trial rights of a defendant.[5] The defendant must show on appeal specific and compelling prejudice which resulted in an unfair trial.[6] Gaines sought a severance based on Wooderts' assertion of an entrapment defense and Wooderts' extensive criminal history. Although the district court gave appropriate limiting instructions, Gaines claims he was still prejudiced because Wooderts "came close to admitting guilt" and Wooderts' "extensive criminal record established guilt by association in the minds of the jurors."

"Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the

---

[4]    *See United States v. Munoz*, 15 F.3d 395 (5th Cir. 1994).

[5]    *See United States v. Neal*, 27 F.3d 1035 (5th Cir. 1994).

[6]    *See United States v. Cortinas*, 142 F.3d 248 (5th Cir.), *cert. denied*, 119 S. Ct. 224 (1998).

district courts."[7]  Gaines has not made the required particularized showing of prejudice, and, indeed, concedes that the district court gave appropriate limiting instructions.  In these circumstances, where Gaines has made no particularized argument of prejudice, the district court's exercise of its discretion will not be disturbed.

## VI.

The district court departed upward five levels in imposing Wooderts' sentence.  Wooderts objected to this departure at trial, and now appeals his sentence.  The decision to depart is reviewed for abuse of discretion.

The reason for departure, as suggested by the presentence report and as adopted by the district court, was that Wooderts' criminal history score did not adequately reflect the seriousness of his criminal record.  Wooderts' criminal history category was VI, the highest enumerated category, which requires only 13 criminal history points.  Wooderts had a whopping 44 criminal history points.  The district court stated: "There is a symmetry between the 240 month sentence and the number of years you've been involved in criminal conduct.  It is also necessary in my view to reflect the criminal history points that you have."

Upward departure when the criminal history score fails to adequately represent the seriousness of the defendant's record is

---

[7]    *Zafiro v. United States*, 506 U.S. 534, 541 (1993).

permitted and has been endorsed by this Court.[8]   The sentence imposed is consistent with the precedent of this Court, and we decline to disturb the discretion of the district court.

## VII.

The defendants were assigned restitution in the amount of $386,589.03.  The district court determined that a total loss of $888,606.10 had resulted from the chop shop operation, and this total was used to calculate the defendants' total offense levels. Wooderts and Turner challenge the calculation of the amount of loss.  The district court's factual findings as to the amount of loss attributable to a common scheme are reviewed for clear error.

Wooderts challenges the amount of loss used for calculating his offense level, and argues that he could not be held accountable for the value of cars for which the government had not determined the identity of the original owners, because there could not be any certainty that those cars were actually stolen.  He contends that only $482,943.22 of loss is attributable to cars which were specifically identified as having been stolen.  To the contrary, there was indeed evidence indicating that all forty-two identified vehicles had been stolen.  Because Wooderts was the ringleader, all losses were reasonably foreseeable to him.  Given the district court's reliance on the presentence report and the evidence in the

---

[8]    *See, e.g.*, U.S.S.G. § 4A1.2; *United States v. Route*, 104 F.3d 59 (5th Cir. 1997).

-12-

record supporting the presentence report's valuation of the loss, the district court did not clearly err.

Turner challenges the amount of restitution for which he is jointly and severally liable, and argues that because he was acquitted on Counts 2-13, he should not be held liable for loss attributable to those counts. He argues that the conduct for which he was acquitted should not be considered "relevant conduct." He argues that relevant conduct is not coextensive with the scope of the conspiracy, relying on application note 2 to U.S.S.G. § 1B1.3.

"[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."[9]

The district court relied on the presentence report, and found that its conclusions were supported by the evidence. Evidence suggested that Turner was involved from the beginning of the operation as a cutter. Despite the jury's acquittals, because of the different standards of proof governing conviction and proof of relevant conduct, the district court was still entitled to make contrary findings of fact. The district court's conclusions were based on the presentence report and supported by the evidence; thus, the court did not clearly err.

## VIII.

---

[9] *United States v. Watts*, 519 U.S. 148, 157 (1997).

Turner sought a reduction in his offense level for his minimal participation in the conspiracy (U.S.S.G. § 3B1.2). The request was denied. The district court's factual determination is reviewed for clear error. The same logic that discounts Turner's arguments that the entire loss resulting from the scheme should not be attributable to him applies here. The district court found that Turner acted as a "cutter" in the chop shop and was a full participant in the conspiracy. Therefore, a minor participant reduction is clearly not justified. Once again, the district court did not clearly err.

## IX.

Turner argues that a mistrial should have been declared because the government failed to disclose in timely fashion notes from a interview with Wooderts, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). The notes make no mention of Turner. The district court stated that a *Brady* violation occurred, but concluded that the defendants were not prejudiced. The district court's ruling is reviewed for abuse of discretion.

Turner claims he was prejudiced because the notes tended to exculpate him, and because he lost an opportunity to impeach the testimony of government witnesses.

These notes could only be used to impeach two witnesses: Wooderts and Carr, the detective who conducted the interview. The district court determined that Turner elicited favorable testimony

from Wooderts, so there would have been no grounds for impeachment.

With respect to Carr, Turner in fact received the notes in time to use them to impeach Carr, had he desired to do so. And, in fact, Turner cross-examined Carr on this very point. Specifically, Turner was able to elicit the fact that he was not mentioned in the notes.

In light of Wooderts' favorable testimony for Turner, Turner's use of the notes to cross-examine Carr, and the fact that the notes were not available to be used for any other purpose, the district court did not abuse its discretion in denying a mistrial.

## X.

Wooderts, Turner, and Lydia challenge the prosecution's use of plea agreements to "purchase" testimony against them, based on *United States v. Singleton*.[10]  The reasoning in that case is obsolete and has already been rejected by this Court.[11]

## XI.

We have reviewed the remainder of the points raised on appeal for plain error, as error was not preserved in the court below, and

---

[10]     144 F.3d 1343, 1359-61 (10th Cir. 1998), *rev'd*, 165 F.3d 1297 (10th Cir. 1999) (en banc), *cert. denied*, 1999 WL 185874 (U.S. June 21, 1999).

[11]     *See, e.g.*, *United States v. Haese*, 162 F.3d 359 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1795 (1999).

find no grounds for reversal.  For the aforementioned reasons, we AFFIRM the judgments of the district court.